Gerard COLLINS and Paul
Flammia, Plaintiffs,

v.

Benjamin WARD, Commissioner of
Correctional Services of the State
of New York, et al., Defendants.

No. 77 CIV. 5614 (PKL).

United States District Court,
S.D. New York.

Jan. 27, 1987.

Proskauer Rose Goetz & Mendelsohn, New York City, for plaintiffs; Barry Steinhart, of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City, for defendants; Sue Barnett Bohringer, Charles R. Fraser, Asst. Attys. Gen., of counsel.

## OPINION AND ORDER

LEISURE, District Judge:

Plaintiffs Gerard Collins and Paul Flammia have brought this action against defendants, former officials and employees of the New York State Department of Correctional Services, pursuant to 42 U.S.C. § 1983, alleging violations of the Eighth and Fourteenth Amendments to the United States Constitution.[1] Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1343(3) and (4). The matter is now before the Court upon defendants' motion for summary judgment, pursuant to Fed.R.

---

1. Plaintiffs filed their complaint, *pro se,* on November 18, 1977, and served nine of the ten original defendants. Counsel has been appointed for plaintiffs since the filing of their initial complaint. Thereafter, the parties stipulated to the dismissal of all but the four following defendants: Walter Fogg, Robert Seitz, James Murphy and Robert McCaffrey.

Civ.P. 56(c), or in the alternative, for dismissal of the complaint, (1) pursuant to Fed.R.Civ.P. 41(b), for plaintiffs' alleged failure to diligently prosecute their claims, or (2) pursuant to Fed.R.Civ.P. 12(c), for plaintiffs' alleged failure to file their complaint within the applicable statute of limitations. For the reasons set forth below, defendants' motion for summary judgment is granted; plaintiffs' complaint is dismissed in its entirety.

## BACKGROUND

The following facts are developed from the sworn testimony of the deposition witnesses, and the affidavits and the Rule 3(g) statements submitted by the parties in this motion, as specifically indicated by references below.

Shortly before April 29, 1975, plaintiffs were transferred to the Green Haven Correctional Facility ("Green Haven") in Stormville, New York, from the Metropolitan Correctional facility in the City of New York. Flammia was housed in the Green Haven Hospital (the "Hospital") as a patient. He had been hospitalized for eighteen months due to a heart condition and in order to recover from recent surgery. Collins, Flammia's brother-in-law, was also assigned to the Hospital because of a shortage of beds elsewhere in Green Haven. Defendants' Rule 3(g) Statement ("D. Statement") at ¶ 3.

On April 8, 1975, inmate Oliver Robinson was admitted to Green Haven. Because Robinson was suspected of being afflicted with tuberculosis, he was assigned to the prison hospital, as well. *Id.* at ¶ 7. Plaintiffs allege, and for the purpose of this decision the Court will assume, that Robinson had a history of psychiatric disorder and he was, at the time of his admission, emotionally disturbed. Plaintiffs' Rule 3(g) Statement ("P. Statement") at ¶ 7.

On April 29, 1975, at about 2:30 a.m., Robinson barricaded the door of the Tuberculosis Ward, in which he and several other inmates were housed. He refused to remove the barricade despite the urgings of members of the hospital night staff.

Throughout this incident, Robinson was brandishing razor blades and throwing metal pitchers and bowls at any member of the staff who tried to enter the Ward.

At approximately 7:30 a.m., corrections officers successfully distracted Robinson with a blast of water from a fire hose; six officers then subdued him. Nevertheless, Robinson was still able to attempt suicide by deeply slashing both his wrists before he was placed completely under the officers' control. The corrections officers never considered the use of tear gas in subduing Robinson. P. Statement at ¶ 8. The hospital staff then treated and dressed Robinson's wounds. He was then sedated and locked in a mental observation room in Dormitory 1, located in the West Wing of the Hospital. D. Statement at ¶ 8.

Later that day, Robinson began undoing the dressings of his wounds. Dr. Rasa Rajanayagam, the physician on duty, then instructed a corrections officer to unlock the door to Robinson's mental observation room. When the officer did so, Robinson, waving what appeared to be a shard of glass—later discovered to be a plastic splint—escaped from his room. He then grabbed several pairs of surgical scissors, a crescent wrench, several one-pint bottles of Betadine—an antiseptic soap—and an industrial mop wringer. He then positioned himself in Dormitory 1, about 45 feet from its entrance. After wedging a stretcher into the Dormitory door, he crouched or otherwise knelt behind a wooden chair. Although Robinson had not technically blockaded the door, the combination of the stretcher and his continued use of various objects as projectiles enabled Robinson to secure his position. D. Statement at ¶¶ 9–10.

By thus ensconcing himself, Robinson also succeeded in cutting off a group of inmates from the Dormitory's exit. Robinson had effectively taken these prisoners hostage. The inmates could not escape, nor could the prison staff, without risking harm, cross the dormitory's threshold to rescue the inmates. D. Statement at ¶ 10;

*see also* Transcript of James Murphy's Deposition, November 12, 1985, at 99.

There is no evidence that Robinson expressly threatened any of his hostages. P. Statement at ¶ 13. However, he threatened to kill anyone who entered the room. D. Statement at ¶ 13; Transcript of Walter Fogg's Deposition, November 7, 1985 ("Fogg Dep.") at 71. When members of the prison staff attempted to communicate with Robinson, their efforts were met by various projectiles, namely, bottles and the mop wringer, hurled by Robinson. The mop wringer was thrown so hard that it dented the door to the dormitory. D. Statement at ¶ 13.

Defendant Robert Seitz, at the time a Lieutenant at Green Haven, was notified of the disturbance. When he arrived at the Hospital, Seitz ordered that *all* inmates outside of Dormitory 1 be secured in Dormitory 2—located almost 85 feet from the blocked door. Seitz checked that his order had been carried out; he was assured by unnamed subordinate corrections officers that it had been. *Id.* at ¶ 18; Transcript of Robert Seitz's Deposition, June 12, 1985 ("Seitz Dep.") at 104–05.

Contrary to what Seitz was told, plaintiffs were actually located in the hospital library—a ventilated room—situated about 54 feet from the entrance to Dormitory 1. D. Statement at ¶ 19. Plaintiffs were instructed by an unidentified corrections officer to remain in the library, behind a closed, unlocked door. Plaintiffs assert that the ventilation of the library was inadequate to prevent them from suffering ill effects, when they were subsequently exposed to the tear gas detonated in order to subdue Robinson. P. Statement at ¶ 19.

Defendant Walter Fogg, at the time Deputy Superintendent for Security at Green Haven, then arrived at the scene of the disturbance. Fogg conferred with Seitz and the other corrections officers on the scene. He was assured, as had been Seitz, that all the inmates, not being held hostage by Robinson, had been secured in Dormitory 2. D. Statement at ¶ 20; Fogg Dep. at 39. He was also told about the unsuccessful attempts to communicate with Robinson, and Robinson's violent responses to those attempts.

At the time of Robinson's initial eruption, Fogg had been concerned about its impact upon Green Haven's 2,000 maximum security inmates and, more specifically, about the potential for the spread of this disruption or other uneasiness through the facility. Fogg Dep. at 55; *see also* Seitz Dep. at 120. In this regard, Fogg noticed that the inmates secured in Dormitory 2 were becoming noisy. Fogg Dep. at 39. In addition, Fogg was concerned about inmates locked in the mental observation rooms—located in Dormitory 1—harming themselves during any such disruption. Fogg Dep. at 75–76.

Fogg sought advice from his officers as to the most appropriate means to subdue Robinson. According to Seitz, the officers considered alternatives to tear gas, such as mattresses, plastic shields, or a fire hose. D. Statement at ¶ 32(d). These alternatives were rejected either because they were not available or because the officers believed them to be ineffective. *See, e.g.,* Fogg Dep. at 79, 96–97; Seitz Dep. at 112. Therefore, Fogg concluded that tear gas was the only feasible method to regain control over Robinson and free the inmates held hostage.

Before actually using the tear gas on Robinson, Fogg consulted with Dr. Rajanayagam and Nurse Simmons in order to ascertain the advisability of targeting tear gas at Dormitory 1. D. Statement at ¶ 32(a). Fogg spoke with the medical personnel about the hostage inmates. Fogg Dep. at 78, 84. There is no indication that Fogg and the medical personnel discussed plaintiffs' possible reaction to the gas. In light of defendants' belief that plaintiffs were secured in Dormitory 2, the omission does not appear unreasonable. After the discussion, Dr. Rajanayagam said that if tear gas was the only way, then the officers should proceed. Affidavit of Barry Steinhart, sworn to on July 10, 1986, Exhibit 11 at 96.

Fogg and the officers then discussed which type of tear gas to use.[2] Fogg determined to use "CN tear gas, the least potent type of tear gas available to correctional and law enforcement personnel." D. Statement at ¶ 32(b). Then upon the recommendation of defendant McCaffrey, at the time a corrections officer at Green Haven, Fogg ordered the use of CN 109 grenades, "the smallest tear gas grenades available, each of which contained ... 0.7 ounce of tear gas." Id. at ¶ 32(c).

Fogg then directed McCaffrey to open the door and toss in the CN 109 grenade. McCaffrey did so and then he immediately closed the door. The gas, however, did not affect Robinson because the wind from some open windows at the back of the room was pushing the gas away from him. Id. at ¶ 21. Therefore, Fogg directed McCaffrey to detonate a second CN 109 grenade. When McCaffrey opened the door to toss in the second grenade, Robinson either threw or kicked the first grenade back into the corridor. An unidentified officer quickly threw the grenade back into the Dormitory. Id. at ¶ 22. When the officers observed the gas affecting Robinson, they entered the Dormitory and subdued him with the aid of a blast of water from the firehose. He was removed from the dormitory to a cell in Green Haven's Special Housing Unit, where he died soon thereafter.

As described earlier, during the disturbance, plaintiffs were not secured in Dormitory 1, but were instead situated in the library. Plaintiffs claim that they were exposed to the tear gas from both grenades. After they began to feel the effects of the gas, plaintiffs attempted to escape the library; the unidentified guard, however, purportedly wearing a gas mask, ordered them to remain. Plaintiffs began gasping for breath, gagging and choking. Transcript of Gerald Collins' Deposition, November 21, 1985 ("Collins Dep.") at 51.

Plaintiffs allegedly stayed in the room "until the tear gas became so thick they could not breathe." P. Statement at ¶ 26; see also, Collins Dep. at 51–52. Collins then opened the library door and assisted Flammia over to Dormitory 2. Nurse Simmons, who was not wearing a mask, then asked an officer to open a window. Plaintiffs moved over to the window and inhaled some fresh air. Nurse Simmons also provided both plaintiffs with oxygen. Collins Dep. at 52.

It is undisputed that under the general supervision of defendants Seitz and Murphy, as well as Officer Frank Wallace, Green Haven's fire and safety officer, the staff started decontamination procedures immediately after Robinson was removed from the Hospital. D. Statement at ¶ 27; Fogg Dep. at 98. "Windows not open before the gas was used were opened, and fans were placed in the areas affected by the gas and turned on. Later in the day, Seitz inquired whether the decontamination efforts were proceeding and was told that they were." D. Statement at ¶ 27. Plaintiffs add, however, that after their "exposure to tear gas they were housed in that same area before it had been fully decontaminated...." P. Statement at ¶ 27.

After assisting his brother-in-law over to Dormitory 2, Collins—in response to a request from a corrections officer—spent several hours assisting in the Hospital clean up effort. Collins Dep. at 63–64. During this time, Collins allegedly could smell tear gas. According to Collins, Nurse Simmons gave him aspirin and oxygen as he continued to work. Id. at 72.

Collins claims that he felt upset the day after the incident. He further alleges that as a result of his exposure to the gas, he suffers from incurable emphysema. It is undisputed that Collins has been exposed twice to tear gas prior to the incident of April 29, 1985—once during the 1940s

---

**2.** "All security employees of the Corrections Department received training in the use of various kinds of force, including chemical agents and firearms. Specifically, prior to April 29, 1975, defendants Fogg, Seitz, Murphy, and McCaffrey had received practice training and classroom instructions in the use of tear gas, the various methods of delivery, and decontamination procedures." D. Statement at ¶ 15.

while serving in the military, the other time in 1973 while incarcerated in the Queens House of Detention. *Id.* at 123–24. It is also undisputed that Collins smoked cigarettes for approximately 35 to 40 years prior to April 29, 1975. *Id.* at 119

Following the incident, Flammia suffered another heart attack. He has little recollection of the events that followed, until the next day, when he regained consciousness. Flammia, however, does remember that he was released from the hospital and into the general prison population after about ten days. It is undisputed that Flammia smoked cigarettes for approximately 30 years prior to the incident.

## LEGAL DISCUSSION

Plaintiffs contend that the facts demonstrate that the use of the tear gas was unwarranted. They allege that inmate Robinson never threatened to harm the inmates in Dormitory 1, directing his threats only at those corrections officers who attempted to enter the room. Plaintiffs claim that Robinson was the only prisoner failing to cooperate, and that there was no opportunity for the general prison population to join or aid him. They conclude that the situation was localized, contained and, consequently, not an extreme emergency. Therefore, Fogg's order to use tear gas was reckless, contraindicated under the circumstances and in violation of department policy. Furthermore, the other defendants should not have obeyed Fogg's orders unless such orders complied with procedures as set forth in Department rules and regulations. Plaintiffs also claim that the facts suggest that even if the use of tear gas were proper, defendants neither properly provided plaintiffs with proper and adequate medical care nor did they properly decontaminate the area. These actions or omissions to act allegedly amount to a violation of plaintiff's constitutional rights.

Defendants respond that Robinson created an extreme emergency. They allege that he posed an immediate threat to the safety of the inmates that he held hostage in Dormitory 1 and to the medical and security staff present. Furthermore, they claim that the disturbance Robinson created constituted a general threat to the safety and security of the entire prison population. Defendants further allege that Fogg properly determined that under the circumstances at hand, security and safety considerations required that tear gas be used to subdue Robinson. Defendants contend that Fogg had the discretion to order the use of tear gas in any incident which in his judgment warranted it. They also argue that no corrections officer had the authority to refuse to detonate tear gas when ordered to do so by the deputy superintendent for security.

### A. *Summary Judgment*

At this juncture the question before the Court is not whether plaintiffs have provided enough evidence through their motion papers to establish their Section 1983 claims; rather, the Court faces the question whether defendants have satisfied their burden so as to be entitled to summary judgment. Fed.R.Civ.P. 56(c) provides that summary judgment shall be rendered if the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See, e.g., Falls Riverway Realty, Inc. v. City of Niagra Falls,* 754 F.2d 49, 57 (2d Cir.1985); *R.G. Group Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984). "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson v. Liberty Lobby Inc.,* — U.S. —, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986); *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir. 1985)).

In order to render summary judgment, a "court must also determine that any unresolved issues are not material to the outcome of the litigation." *Knight, supra,*

804 F.2d at 11. "[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) (per curiam).

As the Supreme Court has noted, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which were designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, —— U.S. ——, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1) (citation omitted). The Supreme Court has recently provided guidance in applying the standard for granting a motion for summary judgment. *See Celotex, supra*, 106 S.Ct. 2548; *Anderson, supra*, 106 S.Ct. 2505; *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, —— U.S. ——, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In *Celotex, supra*, the Court, reversing the decision of the District Court of Columbia Circuit held that:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issues as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof.

106 S.Ct. at 2552–53.

In *Anderson, supra*, the Court, in considering the question of whether the clear and convincing evidence requirement under libel law must be considered by a court ruling on a motion for summary judgment, noted that "the substantive law will identify which facts are material" for purposes of summary judgment. 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (Citation omitted).

More significant for purposes of the instant motion, the Court also held in *Anderson* that:

> [S]ummary judgment will not lie if the dispute about a fact is "genuine," that is if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

*Id.* In addition, the Court noted that there "is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. [Citation omitted.] If the evidence is merely colorable, [citation omitted] or is not significantly probative, [citation omitted], summary judgment may be granted." *Id.* at 2511. Therefore, the standard for summary judgment "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 2511.

B. *Plaintiffs' Claim that Defendants' Use of Tear Gas Constituted Cruel and Unusual Punishment*

The Eighth Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. This language manifests "an intention to limit the power of those entrusted with the criminal-law function of government." *Ingraham v. Wright*, 430 U.S. 651, 664, 97 S.Ct. 1401, 1408, 51 L.Ed.2d 711 (1977). "An express intent to inflict unnecessary pain is not required, [citation omitted] and 'conditions of con-

finement' may constitute cruel and unusual punishment because such conditions 'are part of the penalty that criminal offenders pay for their offenses against society.'" *Whitley v. Albers,* —— U.S. ——, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

■ Nevertheless, "[n]ot every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny...." *Whitley, supra,* 106 S.Ct. at 1084. "After incarceration, only the 'unnecessary and wanton infliction of pain' ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Ingraham, supra,* 430 U.S. at 670, 97 S.Ct. at 1412 (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)). "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley, supra,* 106 S.Ct. at 1084. Rather, "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause...." *Id.* This standard applies whether "that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring *official control over a tumultuous cellblock." Id.* (emphasis added). Thus, "[t]he infliction of pain in the course of a prison security measure, ... does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Id.*

■ Recently, in *Whitley, supra,* 106 S.Ct. 1078, the Supreme Court decided what standard governs a bystander prison inmate's claim that prison officials subjected him to cruel and unusual punishment by shooting him during their attempt to quell a prison riot.[3] The Court stated that:

> Where a prison security measure is undertaken to resolve a disturbance, ... that indisputably poses significant risks to the safety of inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

*Id.* at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom. John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

■ The factors to be considered in reaching that determination are "'the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted,'" *Whitley, supra,* 106 S.Ct. at 1085 (quoting *Johnson, supra,* 481 F.2d at 1033) and "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." *Whitley, supra,* 106 S.Ct. at 1085. From these factors inferences may be drawn "as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* (Citation omitted).

Accordingly, in ruling on a motion for a summary judgment on this issue, the Court

---

**3.** In *Whitley,* the Supreme Court also noted, in the context of forceful prison security measures, that "[i]t would indeed be surprising if ... 'conduct that shocks the conscience' or 'afford[s] brutality the cloak of law,' and so violates the Fourteenth Amendment, [citation omitted], were not also punishment 'inconsistent with contemporary standards of decency' and '"re-

pugnant to the conscience of mankind,"'" [citation omitted], in violation of the Eighth." 106 S.Ct. 1088. Thus, the Court held that in the "prison security context ... the Due Process Clause affords [prison inmates] no greater protection than does the Cruel and Unusual Punishments Clause." *Id.*

must determine "whether the evidence, capable of being introduced to a jury at trial, goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives." *Id.* at 1085–86. "Unless it appears that the evidence, viewed in the light most favorable to the plaintiff[s], will support a reliable inference of wantonness in the infliction of pain under the [aforementioned] standard ..., the case should not go to [trial]." *Id.* at 1086.

■ The first factor the Court must consider in reaching its determination of whether defendants' use of tear gas violated plaintiffs' constitutional rights is the extent of the threat posed by Robinson's actions to the "safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them...." *Id.* at 1085. The substantive question before the Court pursuant to this factor is whether Robinson's actions created an emergency. In answering this question the Court is guided by the teaching of the *Whitley* Court as follows:

> [I]n making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used.

*Id.* at 1084–85. The undisputed facts support the conclusion that this disturbance constituted an emergency.

■ Robinson, armed with bottles, scissors, a wrench and a mop wringer—and, potentially, with whatever else he could find during the time he was not under the control of prison authorities—held a group of ailing inmates hostage. Robinson was throwing bottles and other objects at corrections officers and medical personnel who were seeking to gain control over the situation. Robinson was also threatening to kill any member of the prison staff who attempted to enter the large ward area at the back of Dormitory 1.

Plaintiffs argue that this was not an *extreme* emergency; yet they apparently concede that an emergency situation did exist. *See*, D. Statement at ¶ 13; P. Statement at ¶ 13. Plaintiffs seem to suggest that because Robinson was only expressly threatening the prison staff, that the need for action to subdue Robinson was somehow lessened. That Robinson never explicitly threatened his hostages was understandably of small comfort to defendant Fogg, especially in light of Robinson's apparent mental instability. Moreover, even if Robinson had not directly threatened the hostages, plaintiffs cannot deny that he might have, at any time, turned on those inmates, not to mention the members of the prison staff who were also in the area of danger.

Plaintiffs also neglect to consider and negate the possible harm Robinson's ongoing disturbance might have caused the inmates confined in mental observation rooms or to the inmates held hostage by Robinson. In addition, although plaintiffs conclusorily assert that there was no threat or danger of other inmates creating a riotous situation at Green Haven, there is evidence that Fogg had already been concerned during the first Robinson incident of the possible dangerous impact such a disturbance could have on Green Haven's 2,000 or more maximum security inmates. In addition there is evidence that during the second incident, Fogg was mindful that the inmates locked in Dormitory 2 were making a lot of noise. Therefore, the Court concludes that Fogg in good faith was concerned about a possible expansion in the scope of the emergency.

Additional factors the Court must consider under *Whitley, supra,* 106 S.Ct. 1078, are the "need for the application of force, the relationship between the need and the amount of force that was used ... and any efforts made to temper the severity of [the forceful] response." *Id.* at 1085. Plaintiffs fail to submit any evidence that suggests that defendants used the tear gas "maliciously and sadistically for the very purpose of causing harm." *Johnson, su-*

*pra,* 481 F.2d at 1033. Plaintiffs merely suggest that defendants should have attempted to subdue Robinson with alternative means, such as a water hose or a mattress, before utilizing tear gas. Plaintiffs note that the hose had been previously used to regain control over Robinson. Plaintiffs also imply that because defendant Fogg had never used tear gas before, that this somehow proves that the gas should not have been used in this instance. Finally, plaintiffs argue that the use of gas in a hospital setting, in and of itself, is an obvious violation of plaintiffs' constitutional rights.

 The Court does not doubt that there are always alternative methods, other than tear gas, to subdue riotous prisoners. That, however, is not the question before the Court. Rather, the Court only looks to the relationship between the amount of force actually used and the need for that force. And in evaluting that relationship the Court must be mindful that in such a setting Courts should "hestitate to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." *Whitley, supra,* 106 S.Ct. at 1085. In the context of open prison unrest and conflict, "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators...." *Rhodes, supra,* 452 U.S. at 349 n. 14, 101 S.Ct. at 2400 n. 14. " 'Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.' " *Whitley, supra,* 106 S.Ct. at 1085 (quoting *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447) (citations omitted). That level of deference applies to preventive steps taken to limit the potential for prison unrest, as well as to "security measure[s] taken in response to an actual confrontation with riotous inmates...." *Whitley, supra,* 106 S.Ct. at 1085. This standard does not allow courts or juries to "freely substitute their judgment for that

of officials who have made a considered choice." *Id.*

The question is merely whether the use of tear gas in this situtation was reasonably related to the circumstances. The Court concludes that it was. Before giving the order to use tear gas, Fogg first conferred with his officers to determine whether the inmates had been secured in Dormitory 2, away from the area where the gas would be released. Second, before using the gas, the staff tried to reason with Robinson. In so doing, they determined entering Dormitory 1, without protection, would be dangerous. Fogg then attempted to determine, with the medical personnel available to him at the time, whether the use of tear gas would unduly harm Robinson or the inmates he held hostage. Defendants did not question the medical personnel about plaintiffs, specifically, because defendants reasonably believed that plaintiffs were secured in Dormitory 2.

Only after the aforementioned discussions, did Fogg decide to use tear gas. He then chose CN gas, the least potent form of gas available. Finally he ordered the use of the smallest tear gas grenade available. These actions hardly rise to the aformentioned standard necessary to find an act to constitute cruel and unusual punishment.

Although defendants did use gas in the Hospital, they did not choose the location of the disturbance. Moreover, they clearly employed special precautions to minimize the harmful effects of the gas on innocent bystanders. In light of the foregoing, the Court here determines that a reasonable fact finder could not view defendants' actions as constituting cruel and unusual punishment of plaintiffs.

C. *Plaintiffs' Claim that Defendants Did Not Provide Proper Care After the Incident*

 Plaintiffs' second set of claims is comprised of their allegations that after the tear gassing incident: (1) plaintiffs were not properly evacuated from the area; (2) the area was not properly decontaminat-

ed; (3) plaintiffs were not properly instructed on how to protect themselves from the effects of tear gas; and (4) defendants failed to provide plaintiffs with first aid and medical treatment. The standard to be applied to these claims is that of "deliberate indifference" on the part of defendants to the needs of plaintiffs. *See, e.g., Estelle, supra* 429 U.S. 97, 97 S.Ct. 285; *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974). After considering the meager evidence submitted by plaintiffs, the Court concludes that a reasonable fact finder could hold, at best, that defendants' actions constituted negligence; therefore no reasonable jury could find that defendants' actions or omissions constituted a constitutional violation. *See generally Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (the Supreme Court concluded that the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss or injury to life, liberty or propery); *see also Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986).

The standard for determining whether a failure to provide medical care amounts to a constitutional violation was announced in *Estelle, supra,* 429 U.S. 97, 97 S.Ct. 285. In *Estelle,* the Supreme Court held that deliberate indifference by corrections personnel to a prisoner's serious illness or injury constituted cruel and unusual punishment, violating the Eighth Amendment. Such indifference may be demonstrated by intentionally denying or delaying access to medical care or intentionally interfering with treatment once it is prescribed. *Id.* at 104–05, 97 S.Ct. at 291–92. For a claim of inadequate medical treatment to be deemed sufficient to state a claim under § 1983, it must allege conduct which is shocking to the conscience or amounts to barbarous acts committed upon the plaintiff. *Church v. Hegstrom,* 416 F.2d 449, 451 (2d Cir. 1969); *Bishop v. Stoneman* 508 F.2d 1224 (2d Cir.1974); *Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir.1972). "Mere negligence in giving or failing to supply medical treatment alone will not suffice...." *Church, supra,* 416 F.2d at 451.

The Court notes that it is undisputed that plaintiffs received medical attention. Both plaintiffs stated that Nurse Simmons ministered to their needs. Nurse Simmons provided oxygen to both plaintiffs. Collins stated that while he was helping in the clean up effort, he received oxygen and aspirin on request. Plaintiffs do not at any time allege that defendants failed to provide any medical attention requested by plaintiffs. Instead, plaintiffs conclusorily allege that, in light of Flammia's heart attack and Collins' emphysema, the medical care provided by defendants must have been inadequate. Plaintiffs' ailments, absent a showing of any indifference on the part of defendants, fail to amount to a constitutional transgression. As the Supreme Court noted in *Estelle, supra,* 429 U.S. 97, 97 S.Ct. 285:

> Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 106, 97 S.Ct. at 292.

■ With respect to plaintiffs' claim regarding inadequate or improper contamination, there is ample evidence in the record describing defendants' efforts to ventilate the area. It is undisputed that defendants opened windows and used fans in the area affected by the gas. Plaintiffs fail to introduce evidence detailing any actions or omissions which could constitute deliberate indifference. Instead, plaintiffs conclusorily assert that the housing of plaintiffs in the same area before it had been fully decontaminated, in and of itself, amounts to a violation of plaintiffs' constitutional rights. Plaintiffs' failure to provide any specific evidence on this point is especially damaging in light of Collins' participation, for several hours, in the effort to clean up the Hospital.

In essence, plaintiffs' secondary claims assert that prison officers should be held liable for any harm caused to bystander

inmates, even in the absence of any showing of deliberate indifference or recklessness on the part of corrections officials, after such officials are forced to use tear gas on another inmate. This Court declines to hold that prison officials to such a rigorous standard.

## CONCLUSION

For the reasons set forth above, defendants motion for summary judgment is granted.[4] Plaintiffs' complaint is hereby dismissed in its entirety.

SO ORDERED.

---

**4.** For the reasons stated herein, the Court does not deem it necessary to reach defendants' arguments regarding defendants' qualified immunity, plaintiffs' alleged failure to file their claim within the applicable statute of limitations or plaintiffs' alleged failure to diligently prosecute their claim.