**Perry BELLAMY, Plaintiff,**

v.

**Jacqueline McMICKENS, et al., Defendants.**

**Perry BELLAMY, Plaintiff,**

v.

**Richard KOEHLER, et al., Defendants.**

**Nos. 86 Civ. 5190 (RWS), 87 Civ. 1595 (RWS).**

United States District Court, S.D. New York.

July 15, 1988.

Perry Bellamy, Fishkill, N.Y., pro se.

Peter L. Zimroth, Corp. Counsel, New York City (Ronald P. Younkins, Elaine Rothenberg, of counsel), for defendants.

## OPINION

SWEET, District Judge.

Former Commissioner of Prisons of New York City Jacqueline McMickens ("McMickens"), Former Deputy Warden of Rikers Island Simmons ("Simmons"), barber at Rikers Island Dennis Washington ("Washington"), Corrections Officer James ("James"), Current Commissioner Richard Koehler ("Koehler"), Deputy Warden Jannie Poullard and Corrections Officers Wharton, Thorne, Sanchez, Shade, and Brown (collectively, the "defendants"), defendants in this consolidated action have moved for summary judgment against *pro se* plaintiff Perry Bellamy ("Bellamy") pursuant to Rule 56, Fed.R.Civ.P. For the reasons set forth below, the motion is granted in part and denied in part.

*Prior Proceedings*

Bellamy filed a complaint on July 10, 1986, pursuant to 42 U.S.C. § 1983 alleging that defendants, officials or employees of the New York City Department of Corrections ("DOC"), deprived him of his civil rights while he was incarcerated at Rikers Island Correctional Complex ("Rikers"). He filed a second complaint on March 10, 1987 before the Honorable John E. Sprizzo with similar allegations. On November 10, 1987 this court granted a motion to consolidate the cases.

Several previous applications have been filed in this case. On July 1, 1987, this court issued a memorandum opinion denying both the defendants' motion to dismiss for failure to appear at a deposition and Bellamy's motion for transfer to a federal prison. At that time, Bellamy's motion for appointment of counsel was denied with leave to renew. On March 3, 1988, this court denied Bellamy's motion for the production of documents based on the defendants' representation that they would comply with the requests. Finally, on May 6, 1988 this court denied Bellamy's requests for a gag order against anyone discussing his cooperation and for permission to communicate with his jailhouse lawyer, who had since been moved to another facility. His renewed request to be transferred to a federal prison was also denied. However, his request for counsel was granted insofar as the *pro se* office was requested to seek to obtain counsel to represent him.

The instant motion was filed by the defendants on March 14, 1988 and all papers were fully submitted as of April 29, 1988.

*Facts*

Bellamy was incarcerated at Rikers Island after having been arrested for the "contract" murder of Parole Officer Brian Rooney. The contract was ordered by Lorenzo "Fat Cat" Nichols ("Nichols"), a parolee under Rooney's supervision who had been convicted on drug charges. Upon his arrest, Bellamy arranged to cooperate with the prosecution in hope of leniency.

In response to Bellamy's cooperation, Nichols has allegedly taken out a "contract" on Bellamy's life. DOC officials are aware that Nichols poses a serious threat to plaintiff's life and have conceded as much in their moving papers. For example, in February 1988, plaintiff's father was murdered. DOC officials believe that Nichols had Bellamy's father murdered to draw Bellamy into a non-secure area such as a hospital or funeral parlor where he could then be killed.[1]

According to the defendants, the DOC took extensive steps to ensure Bellamy's safety. For example, the DOC kept Bellamy in a maximum security tier in total separation from all other prisoners. He

---

1. Nichols has also been suggested as a suspect in the recent execution-style murder of Officer Edward Byrne, who was killed while guarding a witness' house.

was never permitted outside of his cell unescorted, and when he left Rikers Island he wore a bullet proof vest and was escorted by several armed officers. Warden Simmons, a defendant in this case, placed Bellamy's case on "centrally monitored" status so that he would never come in contact with Nichols. DOC personnel transferred certain inmates suspected of belonging to Nichols' organization to other facilities. Even Bellamy's food was carefully inspected.

According to Bellamy, however, the defendants did not adequately insulate him from the danger posed by Nichols. He describes an incident occurring on February 18, 1986 while he was in his cubicle preparing to go to court to testify at a preliminary hearing on the Rooney case. His cubicle is separated from the guards' area by a security gate and a locked door. On that particular morning, civilian barber Washington and his inmate assistant Luke Stephens ("Stephens") were on Bellamy's floor cutting the inmates' hair. They were both in the guards' area adjacent to Bellamy's locked cubicle. Officer James was situated about 7–8 feet from the plaintiff's cell and was talking to the barber Washington while the assistant Stephens was sweeping up. According to Bellamy, Stephens, acting on behalf of Nichols, stuck the handle of the broom through the bars of Bellamy's cell and struck him in the eye.

In addition to suffering injuries at the hands of Nichols, Bellamy claims to have been abused by prison personnel. He claims that on the evening of December 22, 1986, as a result of a verbal exchange earlier in the day whereby Bellamy was refused the right to see the Christmas show and in trying to get attention broke a light fixture, a dozen officers in full riot gear appeared at his cell to force him inside. They allegedly surrounded him with mattresses, trying to force him into his cell, a demand with which he could not comply since he was on the outside of a locked door. He claims to have offered no resistance while the officers beat him until they were able to handcuff him. When plaintiff was handcuffed on the ground the officers allegedly continued to kick him in the head and stomach, squeeze his testicles and choke him with their clubs. He claims that the officers relented only upon the shouts of other inmates, but that they left him handcuffed for the remainder of the night.

Bellamy further claims that after the altercation he had glass imbedded in his head and neck, his hand was bleeding and his abdomen and testicles were sore. He claims to have requested medical treatment that evening but states that he was refused such care and was treated in the morning only after repeated pleas. He further maintains that he had previously been treated for an infected or swollen scrotum and maintains that his scheduled surgery was delayed in an additional violation of his rights.

In addition to the physical abuse Bellamy claims to have suffered, he also claims that he was denied privileges because of his unique status as a segregated inmate. His complaint states that he was "for all practical purposes restricted to [his] maximum security cubicle 24 hours a day." For example he claims to have been constantly denied the legal calls necessary to get effective assistance of counsel. He would specifically request to speak to his attorney at a given time and the guards would not comply and only allowed him to place the calls several hours later. He claims that for 15 months he was not allowed to go to the prison law library to prepare his case for trial in violation of his guaranteed free access to the courts. He claims that he had requested that he be allowed to attend Sunday Services and that these requests were consistently denied in violation of the First Amendment. Finally, he claims that since he has only a sixth grade education he needs special tutoring in prison. Although he attended classes three times, his lack of skills and segregation meant that he did not benefit from the general classroom instruction. However, his requests both for tutoring and for books sent to his cell have been denied.

*Discussion*

Defendants have moved for summary judgment pursuant to Rule 56 of the Fed.

R.Civ.P. In order to grant summary judgment, the court must determine that no issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). At the summary judgment stage the judge's function is not to weigh the evidence himself, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the moving party must prevail as a matter of law. *Id.* at 251–52, 106 S.Ct. at 2511–12. Mere conclusory allegations or denials will not suffice. *Flaherty . v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). However, since it is the moving party's burden to demonstrate absence of material factual disputes, the court must resolve ambiguities and draw reasonable inferences in favor of the party opposing summary judgment. *Hathaway v. Coughlin,* 841 F.2d 48, 50 (2d Cir.1988) (citations omitted).

Although this court granted plaintiff's request for counsel on May 10, 1988, plaintiff filed all his papers *pro se* and it appears that no attorney has been appointed as of yet. Accordingly, plaintiff's *pro se* complaint shall be construed liberally. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976).

In order to prevail on a section 1983 claim, the conduct complained of must be committed by a person acting under color of state law and the conduct must have deprived the plaintiff of a right or privilege secured by the Constitution or the law of the United States. *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).

### February 18, 1986 Incident

Defendants claim that summary judgment should be granted on Bellamy's claim for failure to protect him on the grounds that Bellamy has done nothing to prove Washington intentionally set him up for attack, that he has not stated a claim against James for negligent failure to protect him, and that Simmons and McMickens did not have sufficient personal responsibility to maintain the claim against them.

### Washington

In support of their motion for summary judgment, defendants argue that Washington did not know Nichols and that Bellamy's allegations of conspiracy are simply too far-fetched to be proven on the facts. Stephens has claimed that Bellamy raped his sister and that he attacked Bellamy in retaliation. Bellamy denies any knowledge of such an incident.

Bellamy alleges that Washington knew or at least knew of Nichols since he was from South Jamaica, where Nichols' reputation was well known and that Stephens was "close to" Nichols and had been sent to stop Bellamy from testifying. He thus claimed that the two conspired in the assault by allowing Stephens to accompany him that morning thereby giving Stephens access to the maximum security tier where Bellamy's cell was located. He further claims that Washington distracted James so that Stephens could assault plaintiff. Bellamy alleges that this was the first and only time that Washington was accompanied by an inmate assistant to cut inmates' hair on the maximum security tier. Bellamy further asserts as proof of the conspiracy that Washington's routine is to appear between 9:30 and 10:00 a.m. to cut inmates' hair. However on this particular morning, Washington and Stephens appeared between 7:30 and 8:00 a.m., just when plaintiff was preparing to go to court to testify about the Rooney murder.

■ Although Washington denies, that he knew Nichols or varied his routine that morning, the circumstances alleged, if established, may infer the existence of the conspiracy. At a minimum plaintiff's claims raises material issues of fact, and in view of the liberal standards against which a *pro se* opposition to summary judgment must be judged, Bellamy is entitled to the opportunity to prove his claim with respect to the February 18 incident.

### James

■ Bellamy claims that Officer James negligently allowed himself to be distracted

by Washington giving Stephens the chance to assault him. In order to prevail on a claim of negligent protection, the plaintiff must prove that a pervasive risk of harm from other prisoners exists and that prison officials displayed deliberate indifference to that danger. *Villante v. Department of Corrections for the City of New York*, 786 F.2d 516, 523 (2d Cir.1986). In *Morales v. New York State Department of Corrections*, 842 F.2d 27, 30 (2d Cir.1983), the plaintiff and another inmate were separated because of the particular hostility between them. Nevertheless, the inmate gained access to the plaintiff's cell and attacked the plaintiff while he slept. The court determined that plaintiff could prevail on his § 1983 claim if he could show deliberate indifference of prison officials to the consequences of their conduct to those under their control. *See also Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed. 2d 632 (1982) (plaintiff in protective custody was recklessly allowed to come into contact with other inmates); *Bass v. Jackson*, 790 F.2d 260 (2d Cir.1986) (guards may have been deliberately indifferent to the threat inmates who "ran" the cell block posed to plaintiff); *Holmes v. Goldin*, 615 F.2d 83 (2d Cir.1980) (allowing hostile inmates to come into contact with each other may demonstrate gross negligence).

■ In the instant case, there was an acknowledged threat posed to Bellamy's life. The record indicates that he was under a total separation order, and that based on that order other inmates were transferred to other facilities to ensure that no hostile party could gain access to him. Under these unique circumstances, James' failure to protect Bellamy from attack by another inmate with a potentially dangerous instrument may constitute deliberate indifference to plaintiff's safety.

The defendants ask this court to apply the rule of *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) in which the Supreme Court held that the negligent failure of correction officials to protect a prisoner from assault by another inmate does not violate the Constitution. However *Davidson* is distinguishable from the facts in this case. In *Davidson*, the plaintiff warned the defendants of a threatened attack by another inmate on his life. Prison officials examined the threat and decided that it was not serious enough to warrant any action to protect the plaintiff since prisoners often make empty threats against each other. In the instant case, the plaintiff is not alleging a simple lack of ordinary care in assessing a common-place threat. Thus, whether Officer James was at fault is a question of fact, and Bellamy is therefore entitled to a chance to prove his claim at trial.

*Supervisory Officials*

Plaintiff contends that it was DOC Commissioner McMickens' and Warden Simmons' job to ensure that prison officers carried out their orders regarding plaintiff's protection, and thus that they are responsible for the injuries. Defendants argue that plaintiff cannot show he was injured as a result of an official policy or custom and summary judgment should be granted as a matter of law.

■ Municipalities cannot be held responsible for the acts of their employees solely on a theory of *respondeat superior*. *Monell v. Dep't. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, "personal involvement of a defendant in alleged constitutional deprivations is a pre-requisite to an award of damages under § 1983." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986) (citing *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In *Williams*, this Circuit set forth circumstances under which supervisory officials in an action under § 1983. They may be held liable if they (1) participate directly in the infraction; (2) fail to remedy a wrong after having learned of the violation through a report or appeal; (3) create a policy or custom under which violations occurred, or allowed such a policy or custom to continue; or (4) were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.* at 323–24.

Defendants rely heavily on *Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) which held that a single incidence of unconstitutional conduct by a non-policy making employee is not sufficient to establish the existence of a municipal policy of gross negligence or deliberate indifference. Thus according to defendants, even if Officer James were negligent, McMickens and Simmons could not be found liable because it was a single incidence of unconstitutional conduct.

Bellamy claims that the defendant's were themselves grossly negligent in supervising their officers, that is in carrying out their own duties. He maintains in his complaint and deposition that McMickens' and Simmons' actions were so negligent as to demonstrate a deliberate indifference to the plaintiff's welfare. Here, DOC personnel were acting directly under Commissioner McMickens' instructions. Warden Simmons registered plaintiff as a centrally monitored case and clearly knew of the specific threat that Nichols posed to plaintiff's safety. Prison officials had a list of prisoners who were not to be allowed to come into contact with plaintiff at any time. Bellamy alleges that no one checked to see if Stephens' name was on that list, or to check his clearance or identification for the security tier. Finally Bellamy refers in his deposition to having been occasionally left outside of his cell without an escort, tending to prove a pattern of direct violation of his total separation status.

■ However, these allegations do not set forth adequate grounds for holding Simmons and McMickens liable. Bellamy has set forth one incident where alleged negligence resulted in injury to him. This does not reflect a policy or custom under which violations occurred. If anything, the incident occurred in contrast to an official policy of offering protection to Bellamy. Moreover, one incident does not establish gross negligence in the supervision of inferior officers. Bellamy's contention that he was left outside of his cell without an es-

cort does not bolster his claim, since these alleged events occurred without incident and since he has not alleged that he was left alone in an area where other inmates had full access to him. At best, it could be contended that Simmons was negligent in placing an incompetent officer on the job. However, conduct must rise to the level of gross negligence before liability can be imposed. Conduct rising to this level has not been alleged. Thus, *Tuttle* is controlling. *See also, Villante v. Department of Corrections*, 786 F.2d 516 (2d Cir.1986) (plaintiff can prevail on claim of negligent protection only if can prove deliberate indifference to danger posed by others). Summary judgment is, therefore, granted in favor of Simmons and McMickens.

*December 22, 1986 Incident*

■ Bellamy has charged several captains and officers with use of excessive and unreasonable force.[2] The Eighth Amendment protects prisoners from cruel and unusual punishment administered for disciplinary purpose. *Johnson v. Glick*, 481 F.2d 1028, 1032 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). Courts acknowledge, however, that prison officials have broad latitude in dealing with security problems in their institutions. *Green v. Coughlin*, 633 F.Supp. 1166, 1170 (S.D.N.Y.1986). In determining whether corrections officers used excessive force, the test is whether the security measure taken inflicted unnecessary and wanton pain and suffering. *Whitley v. Albers*, 475 U.S. 312, 320–21, 106 S.Ct. 1078, 1084–85, 89 L.Ed.2d 251 (1986). To determine if the constitutional line has been crossed, the court should look to several factors: the need for the application of force; the relationship between the need and the amount of force used; the extent of the injury; and whether force was applied in a good faith effort to maintain of restore discipline or maliciously and sadistically for the very purpose of causing harm. *Johnson v. Glick, supra*, 481 F.2d at 1038.

**2.** Additionally, he charges Deputy Warden Poullard with issuing an order declaring him guilty of an infraction without a hearing. The ques-

tion of whether Bellamy was denied due process was not addressed in the defendants' moving papers and thus will not be addressed here.

Defendants' version of the facts surrounding that evening's altercation differ sharply from plaintiff's. Defendants claim in their motion and affidavits that plaintiff had destroyed light fixtures in his cubicle and refused to "lock-in" at 11:00 p.m. as required by DOC regulations. Defendants made several verbal attempts to persuade plaintiff to comply with the lock-in order, but plaintiff refused. Pursuant to Deputy Warden Poullard's order, a number of guards using mattresses as buffers trapped and handcuffed Bellamy. The guards struggled with the plaintiff only because he refused to cooperate and aggravated the situation.

Defendants cite extensively to *Whitley, supra,* asking for extreme deference to prison officials acting under pressure. However, *Whitley* is distinguishable from the instant case. There, prison officials were attempting to suppress a full blown prison riot and shot a prisoner in the leg. Not every use of force should be judged under the heightened standard which was appropriate in *Whitley. Stubbs v. Dudley,* 849 F.2d 83 (2d Cir.1988).

In this case, Bellamy posed a much less serious threat than a group of inmates inciting a riot. *Cf. Collins v. Ward,* 652 F.Supp. 500 (S.D.N.Y.1987) (use of tear gas during prison hostage crisis was not excessive). Bellamy was sitting inside his cubicle and maintains that he did not enter his cell because it was locked. He was not armed and argues that he offered no resistance but to protect himself. He further argues that the guards continued to beat him after he was handcuffed. His complaint states that other inmates witnessed the altercation and shouted to the guards to stop beating him because he was helpless.

Defendants contend that Bellamy suffered only minor injuries and thus that the force used was reasonable. Yet a plaintiff may recover if the force was excessive even if his injury is not permanent or severe. *Corselli v. Coughlin,* 842 F.2d 23, 26, (2d Cir.1988) (citing *Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987)). Bellamy sustained obvious injuries requiring medical treatment, which may indicate the use of unreasonable force. It is difficult to understand how plaintiff got glass embedded in his head and neck and bruises on his back unless there was a substantial struggle unbuffered by mattresses.

Because the parties' versions of the facts differ so greatly, summary judgment is denied. *See, e.g. Corselli v. Coughlin, supra, Robinson v. City of Mount Vernon,* 654 F.Supp. 170 (S.D.N.Y.1987); *Wilson v. White,* 656 F.Supp. 877 (S.D.N.Y.1987).

### Denial of Medical Treatment

Plaintiff alleges that he was denied adequate medical treatment on several occasions. A denial of medical care may be serious enough to constitute cruel and unusual punishment. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). To state a 1983 claim, the prisoner must allege a denial "sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* On a motion for summary judgment, plaintiff need not allege a total denial of medical treatment, but merely raise material factual disputes regarding whether defendants demonstrated deliberate indifference to his medical condition. *Archer v. Dutcher,* 733 F.2d 14 (2d Cir.1984).

[12] Plaintiff contends in his papers that he was not given medical treatment as requested on the night of his altercation with the guards. However, the medical records and sworn affidavits of Rikers Island medical personnel demonstrate that a doctor witnessed the forced lock-in and was standing by to treat plaintiff in case any injuries occurred. It was plaintiff who refused treatment until the following morning when he was thoroughly examined for broken bones, lacerations and contusions. His claim of denial of medical treatment is not supported by the record.

Bellamy also contends that he was denied the treatment necessary for a swollen and infected scrotum. Defendants, in support of their motion for summary judgment, have submitted voluminous medical records which indicate that plaintiff's condition was closely monitored. He was treated at Bellevue Hospital Center's Geni-

tourinary Unit on four occasions, and received care in the interim at Rikers Island. Plaintiff's allegations that he was not always treated promptly do not rise to a constitutional violation. There is no evidence in the record which indicates deliberate indifference to his medical condition.

### Denial of Privileges

While "there is no iron curtain drawn between the Constitution and the prisons of this country," *Wolf v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974), courts should afford prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve the internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1978).

Plaintiff's status as a maximum security inmate inevitably infringes upon his free movement at Rikers Island. However, none of the alleged deprivations raised by Bellamy is of constitutional stature.

### Access to Telephones

█ Although prisoners have a right to access counsel from prison, they have no right to unlimited telephone calls. *Lopez v. Reyes*, 692 F.2d 15, 17 (5th Cir.1982). At least one court has held that restricting prisoners to one call per week is reasonable considering prison officials' concerns over security. *Lock v. Jenkins*, 464 F.Supp. 541, 551 (N.D.Ind.1978), *aff'd in part and rev'd in part on other grounds*, 641 F.2d 488 (7th Cir.1981). Further, states have no obligation to provide the best manner of access to counsel. Rather, restrictions on inmates' access to counsel via the telephone may be permitted as long as prisoners have some manner of access to counsel. *Pino v. Dalsheim*, 558 F.Supp. 673, 675 (S.D.N.Y. 1983) (unlimited personal and mail communication suffice).

█ Bellamy does not allege that he was denied absolute access to his counsel by the restrictions on his phone calls, but rather that he was delayed in communicating with his attorney. In his deposition he states that he was always able to get in contact with his attorney, although occasionally he had to wait a day. Defendants maintain that Bellamy was restricted from using the phone whenever he wished because prison officers had to clear the social services area of other inmates in order to comply with the segregation order. They further point to the DOC's policy of providing writing materials, stamps and envelopes so that Bellamy could communicate with his attorney. Since Bellamy by his own admission was allowed to contact his attorney by telephone, defendants are entitled to summary judgment on this claim.

### Access to Law Library

█ Prisoners have a constitutional right of access to the courts. Thus prison authorities must assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law. *Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977). The right of access to the courts must ensure that prisoners have a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts. *Id.* Courts have held that prisoners do not have a right to access law books *per se*, *Inmates, Washington County Jail v. England*, 516 F.Supp. 132 (E.D.N.Y.Tenn.1980) *aff'd* 659 F.2d 1081 (6th Cir.1981), but must be provided with any of several methods designed to provide meaningful access to the courts including the use of trained legal assistants. *Bounds, supra*, 430 U.S. at 830, 97 S.Ct. at 1499.

█ Plaintiff was restricted from using the law library for a period of time because defendants did not have the manpower to personally escort him as required. During this period he received the help of competent jailhouse lawyers who assisted him in filing two legally sufficient claims. Furthermore, plaintiff was eventually permitted to use the library for ten hours a week. Accordingly, defendants' motion for summary judgment on this claim is granted.

### Religious Privileges

█ Prohibiting prisoners' attendance at religious services because they are

confined to administrative segregation is not a violation of the First Amendment since it serves an obvious, legitimate penological objective. *Matiyn v. Henderson,* 841 F.2d 31 (2d Cir.1988); *Smith v. Coughlin,* 748 F.2d 783 (2d Cir.1984). In *Turner v. Safley,* the Supreme Court set forth several relevant factors to be considered in determining whether a regulation infringing upon prisoners' First Amendment rights is reasonably related to legitimate penological interests. Included are inquiries into whether there is a valid, rational connection between the prison regulation and the stated governmental interest and whether alternative means of exercising the right remain open. *Turner v. Safley,* — U.S. ——, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987).

 In the instant case, Bellamy was prevented from attending communal religious services because he was not permitted to mix with the general inmate population. Given the threat other inmates posed to his safety, this is a reasonable restriction. Furthermore, Bellamy was ministered to each week in private and attended bible study classes conducted on the maximum security tier. Restricting Bellamy's attendance at general religious services served a valid penological objective. Summary judgment is, therefore, granted.

*Education*

Plaintiff's claim of inadequate educational facilities does not rise to a constitutional deprivation. Prisoners who pose security risks may be kept separate from others in school as long as they have some access to instruction. *Giampetruzzi v. Malcolm,* 406 F.Supp. 836, 841–42 (S.D. N.Y.1975). An Eighth Amendment claim cannot be founded upon a delay in access to education. *Rhodes v. Chapman,* 452 U.S. 337, 348, 101 S.Ct. 2392, 2400, 69 L.Ed. 2d 59 (1981). Bellamy stopped attending school because his skill level was below that of the classroom instruction. His claim is not that he was denied access to education, but rather that he should be given a tutor for personalized instruction. There is no constitutional support for such

a request. *See e.g., Burnette v. Phelps,* 621 F.Supp. 1157 (M.D.La.1985). Defendants are therefore entitled to summary judgment on this claim.

*Conclusion*

For the reasons set forth above, summary judgment is granted with respect to Bellamy's claims against McMickens and Simmons, and for failure to provide adequate medical care and for failure to permit phone, law library, church and tutorial privileges. Summary judgment is denied in all other respects.

It is so ordered.