UNITED STATES of America,
Appellant,

v.

Irving STERN, Appellee.

No. 591, Docket 74–2522.

United States Court of Appeals,
Second Circuit.

Argued Jan. 13, 1975.

Decided March 12, 1975.

William I. Aronwald, Sp. Atty., U. S. Dept. of Justice (Paul J. Curran, U. S. Atty., S.D.N.Y., and John D. Gordan, III, Asst. U. S. Atty., New York City, on the brief), for appellant.

Raymond Bernhard Grunewald, New York City (Joseph Beeler, Miami Beach, Fla., on the brief), for appellee.

Before LUMBARD, FRIENDLY and GURFEIN, Circuit Judges.

LUMBARD, Circuit Judge:

The government appeals from an order of the Southern District of New York which suppressed, as attorney-client communications, portions of conversations between defendant-appellee Irving Stern and Walter Bodenstein, particularly the material portion of the tape recording of a May 18, 1973, conversation between the two men.

A review of the record of the suppression hearing persuades us that there was no basis for concluding that an attorney-client relationship existed between Bodenstein and Stern at the time of the conversations in question. Nor at argument was counsel able to state what legal advice Stern was seeking. We therefore conclude as a matter of law that the trial court erred in holding the conversation privileged.

The facts are not seriously disputed. The defendant-appellee, Irving Stern, is Vice President of the International Amalgamated Meat Cutters Union. He is under indictment, filed March 21, 1974, for violations of the Racketeer Influenced Corrupt Organizations Act (18 U.S.C. §§ 1962(c),(d)), the Taft-Hartley Act (29 U.S.C. §§ 186(a), (b)), and the Internal Revenue Code (26 U.S.C. §§ 7201, 7206(1)). Stern and his co-defendants are charged with conspiring to demand and accept, and demanding and accepting, payments from employers of members of his union. The indictment further charges the defendants with failing to report the payments so received to the Internal Revenue Service. 26 U.S.C. §§ 7201, 7206(1).

Walter Bodenstein is a New York attorney who operates C.P. Sales, Inc., a meat merchandising company for Iowa Beef Processors, ("IBP"), the largest meat packing company in the United States. Bodenstein and Stern were introduced eight to ten years ago by Moe Steinman, Bodenstein's father-in-law. Since then they have met occasionally in the course of business.

In June 1972 Bodenstein, who was under a tax investigation, informed Stern that Stern's name had been mentioned in the course of the investigation. Stern asked that he be kept informed of developments. Over the summer and fall of 1972 the two remained in contact, Bodenstein keeping Stern informed about the investigation. Upon learning that the investigation related to IBP, Stern asked Bodenstein to represent him. Bodenstein declined to do so.

At this time Stern expressed a fear that his "stock speculations" might be disclosed as a result of the IBP investigation. Stern knew that Moe Steinman, Bodenstein's father-in-law, was a subject of an investigation into bribery of supermarket officials by IBP. Moe Steinman is named in Count 1 of the original indictment against Stern as the person through whom some of the alleged bribes were paid to Stern and his co-defendants.[1]

In January, 1973 Stern was subpoenaed to appear before the New York County Grand Jury, but declined to testify. Thereafter, Stern again met with Bodenstein. He told Bodenstein that in his conference at the County District Attorney's Office there had been intimations of a connection between Steinman and himself, Stern. He again asked Bodenstein to represent him. Bodenstein again refused.

In March, 1973, Bodenstein and Steinman were indicted by a federal grand jury for filing false employers tax returns. Steinman, Currier Holman (an IBP official), and C.P. Sales, Inc., were

1. It should be noted, however, that these alleged payments were in no way related to IBP.

also indicted federally and in the New York Supreme Court for other offenses.

On March 28, 1973, Stern received an IRS notification that his returns were being audited. In early April Stern spoke to Bodenstein about the audit. Bodenstein, unaware that Stern had already retained counsel and had so notified the IRS, recommended a lawyer.

In May Stern met with Bodenstein several times and discussed his fear of being unable to explain the source of $110,000 worth of bonds which he had posted as collateral for loans. Bodenstein was eager to make certain that the bonds were in no way related either to IBP or to his father-in-law, Steinman. Stern was similarly eager to steer clear of Steinman. Bodenstein taped the May 18, 1973 conversation, unbeknownst to Stern, to prove that neither he, IBP, nor Steinman was connected with the bonds.[2]

The conversation itself is the most convincing evidence that it occurred not in an attorney-client context, but in the context of two men under investigation trying to protect themselves from any nuances of corruption that might spill over from one investigation to the other. The major subjects interwoven in their conversation were the investigation of the meat and supermarket industry, Stern's bonds, and expert tax counsel.

At the outset of the conversation Bodenstein repeatedly questioned Stern in an attempt to elicit statements that Steinman had never paid Stern anything on behalf of IBP. Stern answered simply "Well, it's true."

Stern then interrupted to ask about "the George George thing" (George George, a supermarket official) and to say that "Nicky is solid" (Nicholas Abondolo, later to be one of Stern's co-defendants). George George had received some publicity relative to his appearance before a grand jury. The indictment which was filed on March 21, 1974,

against Stern and his co-defendants alleges, as an overt act on the conspiracy count, that George George paid Abondolo $2,000. The district court denied the motion to suppress this portion of the conversation as privileged, but granted the motion as to the rest of the conversation.

Thereafter, in this May 18 conversation, Bodenstein elicited considerable detail from Stern about the bonds and the lenders with whom the bonds had been put up as collateral. At the end of this exchange Stern reiterated that these transactions had "absolutely nothing to do with IOWA [IBP]" and expressed the fear that "they're going to try to link me up with Moe [Steinman]. . . ."

Up to this point the conversation is characterized by a mutual fear that the investigation would reveal a tie-in between IBP and Stern.

Stern then questioned Bodenstein about names of expert tax counsel. Bodenstein's response was "I'll tell you what we did when we checked." Bodenstein proceeded to run through the names of several experts, among them Lou Bender, the tax lawyer whom Bodenstein and Steinman had retained. Finally, Bodenstein suggested "Why don't you have your lawyer get in touch with Bender." This exchange is consistent with a relationship of one man under investigation seeking advice and information from another who had been undergoing a similar investigation.

The balance of the conversation concerned Stern's fears of: (1) being linked to IBP ("The one thing I don't want to link is my situation with MOE and IOWA BEEF . . . ."); (2) losing his lawyer if he consulted an outsider (["W]hat I'm most fearful of is that my guys find out anything about it. * * I got nothing else, I lose them, I'm dead."); (3) being unable to explain the source of the bonds (["U]nless they tell me something, I don't know what to do,

**2.** Bodenstein's decision to tape the May 18, 1973 conversation was prompted by the suggestion of Mr. Elkan Abramowitz, the attorney for Moe Steinman. Both the decision to tape the conversation and the conversation itself predate any cooperation by Bodenstein with the government.

they may try to give a rationale, some bullshit—of inheriting and something. I don't know. I don't know. There's got to be an answer. I just can't have a no answer.").[3]

In response to these expressions of Stern's fear, Bodenstein repeated his own belief that Stern was not involved with IBP, citing as support for this belief his knowledge of the grand jury testimony of "everybody at IOWA BEEF," including his own. Bodenstein further offered to speak to Lou Bender, his tax expert, about the best way for Stern (who would remain anonymous) or his attorney to consult with Bender without causing any "conflict." As Bodenstein put it, "your guy may be better speaking to LOU BENDER than you. I don't know, let me talk to LOU. * * * You're not going to lose your guys, you know. They may go on a consulting basis to LOU. * * * Well let me see what LOU says. . . ."

Of course, Bodenstein and Stern were both under investigation; each was interested in protecting his own interests. Bodenstein wanted further assurances that Steinman had never bribed Stern on behalf of IBP. Stern wanted to be equally certain of not being linked with Steinman: "most important is to keep a separation." The government argues that Stern's motivation in contacting Bodenstein was to check the status of the investigation and to communicate his situation to Steinman indirectly. It is likely that this was part of Stern's motivation in speaking to Bodenstein.

Insofar as Stern confided in Bodenstein about the bonds, it was not, in the context of the conversation, with an eye to seeking legal guidance. Rather, it was in direct response to questions by Bodenstein, a potential co-defendant,

whether he (Bodenstein), his father-in-law, or his business were likely to be implicated in any bribe payments to Stern.

■ Similarly, Stern's requests for help in choosing expert tax counsel were pleas of a frightened man looking for a solution to his problems from someone who might be implicated as a co-defendant if Stern failed to find an explanation for the bonds. Moreover, Bodenstein, having just undergone the ordeal of an investigation, was in a position to provide Stern with advice on securing expert tax counsel.

That Bodenstein was an attorney may well have been an additional factor which caused Stern to ask Bodenstein for advice. However, it was Bodenstein's status as a potential co-defendant under investigation, not as an attorney, which was of paramount importance in their relationship.

■ The burden of establishing the existence of an attorney-client relationship rests on the claimant of the privilege. In re Bonanno, 344 F.2d 830, 833 (2d Cir. 1965). Thus, for Stern to have succeeded on his claim of privilege, he was obliged to prove that his relationship with Bodenstein fit within the privilege. According to Wigmore's formulation of the privilege which this circuit recognized in United States v. Kovel, 296 F.2d 918, 921 (2d Cir. 961):

> "(1) Where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived . . . . "

---

3. The government urges, as an additional ground for reversal, that if Stern was seeking legal advice, it was in the commission of a fraud on the United States government and, as such, was outside the privilege. There is no necessity for our reaching this question since we find that the conversation is not privileged in the first instance. Thus, while it

is unclear what advice Stern hoped to receive from Bender, it is immaterial to Stern's relationship with Bodenstein.

It should be further noted that this court does not construe anything in the record as reflecting in any way on the integrity of Louis Bender.

8 Wigmore, Evidence § 2292 (McNaughton Rev. 1961).

Stern has failed to sustain his burden on both of the first two elements of the privilege. Not only has he failed to demonstrate that he was seeking legal advice from Bodenstein, but, even if names of experts are construed as legal advice, Stern has been unable to establish that he sought the advice from Bodenstein in his capacity as a legal advisor. Rather, as has been amply demonstrated, he sought the advice from a potential codefendant, from a fellow subject of investigation, from a veteran of an IRS audit. Given that there is little dispute over the material evidentiary facts, we conclude as a matter of law that there was no attorney-client relationship between Bodenstein and Stern; therefore, their conversations are not privileged.

■ Nor can the district court's ruling be sustained on the alternative ground that Bodenstein was Stern's agent in dealing with attorney Bender and consequently the communications were privileged.

Although the record below is somewhat ambiguous, it appears that the district court abandoned the agency theory as a basis for its final holding. Instead, it found that "Bodenstein was more than merely an intermediary" and that Stern would not have confided in him had Bodenstein not been "someone who could have the judgments associated with attorneys." To the extent that this constitutes, as it appears to, an abandonment of the agency rationale in favor of a finding of an attorney-client relationsip between Bodenstein and Stern, then our determination that no such relationship existed disposes of the problem and it is unnecessary for us to evaluate the agency theory.

■ To the extent that the district court found that Bodenstein would never have been employed as an agent for communication with Bender had he not had some legal knowledge, that finding was clearly erroneous.

While it was Stern who introduced the subject of tax experts during the May 18 conversation, it was Bodenstein who offered to contact Bender, his own attorney, on Stern's behalf. Moreover, this offer was made well after Stern had already poured out considerable detail about the bonds. Both of these facts are inconsistent with the notion that Stern confided in Bodenstein with an eye to Bodenstein's serving as an agent in communicating with Bender. Certainly Bodenstein's offer to contact Bender was the outcome of the conversation, but it was clearly not the purpose for which Stern's revelations about the bonds were made. Because the agency theory is so decisively contradicted by the conversation itself, it is unnecessary for us to pass on its legal merits.[4]

For the foregoing reasons we find that no attorney-client relationship existed between Bodenstein and Stern. Stern's testimony that such a relationship existed in his mind is contrary to the facts and circumstances and the inferences to be drawn from them. The district court erred as a matter of law in concluding that there was an attorney-client privilege which protected the suppressed portion of the conversation from disclosure.

The order of the district court suppressing portions of the conversations between Bodenstein and Stern is reversed.

**4.** See generally Blankenship v. Rowntree, 219 F.2d 597 (10th Cir. 1955) (holding that a memorandum prepared by a client and delivered to his attorney by an agent of the client was a privileged communication); United States v. Andreadis, 234 F.Supp. 341, 345 n. 3 (E.D.N.Y.1964) (suggesting that the presence of an agent of the client during an otherwise privileged conversation with an attorney may not destroy the privilege where it is a prior agency such as a secretary, nurse or partner); 8 Wigmore § 2311 (communications in the presence of a third party who is not an agent of either the attorney or the client destroys the privilege), § 2317(1) (communications by an agent of the client to the attorney are privileged) (McNaughton rev. 1961).