UNITED STATES of America

v.

Jay E. LENTZ, Defendant.

No. 1:01 CR 150.

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 22, 2005.

Erik R. Barnett, Patricia M. Haynes, Steven D. Mellin, United States Attorney's Office, Alexandria, VA, for United States of America.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this remanded kidnapping for murder prosecution, the defendant seeks suppression of certain tape-recorded telephone communications between defendant Jay E. Lentz ("Lentz") and his attorney regarding a murder-for-hire plot to eliminate key witnesses and the prosecutor in defendant's case. At issue is (i) whether the tape recordings are protected by the attorney-client privilege and (ii) whether the tape recordings were illegally obtained in violation of defendant's Sixth Amendment rights.

### I.

The facts relevant to this motion to suppress occurred following remand of this case for retrial and while Lentz was incarcerated at Northern Neck Regional Jail (NNRJ) awaiting the retrial. Yet, a brief synopsis of the underlying kidnapping for murder prosecution and the procedural history of this case provides the context essential to a full understanding of the questions presented.[1]

Lentz is charged with kidnapping for murder in violation of 18 U.S.C. § 1201(a) for the disappearance and murder of his ex-wife, Doris Lentz ("Doris"). Because neither Doris' body nor a murder weapon were ever found, the government's case against Lentz in the first trial in June 2003 was largely circumstantial. In this regard, the government presented evidence at trial tending to show, *inter alia*, (i) that Lentz had physically and verbally abused Doris during their marriage; (ii) that, based on a prior arrangement between Doris and Lentz, Doris had gone to Lentz's house to pick up their daughter, Julia, on the day Doris disappeared; (iii) that Doris had told her mother, boyfriend, aunt, and friend

---

1. The facts of the underlying case are more fully set forth in the Fourth Circuit's opinion reversing the first trial court's judgment of acquittal, but upholding the grant of a new trial pursuant to Rule 33, Fed.R.Crim.P. *See United States v. Lentz*, 383 F.3d 191, 195 (4th Cir.2004) (*Lentz I*).

that she was going to Lentz's house in Maryland to pick up Julia on the day she disappeared; (iv) that within days of Doris' disappearance, her car was found abandoned in a District of Columbia parking lot, unlocked, and with her purse and keys in plain view; (v) that there were blood stains in the car's interior, nearly all of which contained Doris' DNA; (vi) that one of the blood stains in Doris' car was a match for Lentz's DNA; and (vii) that the driver's seat of Doris' car had been adjusted to fit someone who (like Lentz) was much taller than Doris.

After two weeks of trial and approximately five days of jury deliberation, the jury convicted Lentz of kidnapping resulting in death in violation of 18 U.S.C. § 1801(a), but the district court then entered a judgment of acquittal on the ground that the government's evidence was insufficient to meet the holding element required by the statute. Because certain evidence not admitted at trial had found its way into the jury room, the district court also ordered a new trial. *See United States v. Lentz,* 275 F.Supp.2d 723 (E.D.Va.2003), *rev'd in part,* 383 F.3d 191 (4th Cir.2004) (Memorandum Opinion). On appeal, the Fourth Circuit reversed the trial court's judgment of acquittal, but upheld the grant of a new trial. *See United States v. Lentz,* 383 F.3d 191, 195 (4th Cir.2004) (*Lentz I* ). Accordingly, the matter was remanded for a new trial to be conducted by a different district judge. *See id.* at 221. The matter is now here on remand for a retrial, which is now scheduled to commence on November 28, 2005.

During the interim between the remand of this case and the originally scheduled July 11 trial date, the case took a surprising twist. On May 19, 2005, the government, in an *ex parte,* under seal pleading, represented that it had information from inmate Christopher Jackmon ("Jackmon"), who was incarcerated with Lentz at NNRJ from late 2004 until early 2005, concerning Lentz's murder-for-hire plot. Specifically, Jackmon was prepared to testify that Lentz had discussed his case with him and ultimately had solicited Jackmon's help in a plot to kill (i) certain key prosecution witnesses Lentz believed had provided especially damaging testimony in his first trial; and (ii) one or both of the prosecutors in his case, namely Assistant United States Attorneys Steven D. Mellin and Patricia M. Haynes. Most relevant here, the government also represented that it had obtained tape recordings of three telephone conversations that occurred on January 10, 2005 between Lentz and his attorney, Frank Salvato, that the government believes corroborates Jackmon's story.[2]

These three telephone calls occurred between 9:39 a.m. and 10:26 a.m. on January 10, 2005, and were placed by Lentz to his counsel from a telephone located in "C Pod," the pod that included Lentz's cell at NNRJ. The record convincingly establishes that during the period in question, all outgoing telephone calls from NNRJ were recorded and subject to monitoring by jail officials and that Lentz and his

---

**2.** According to the government, it obtained these recordings, in part, to ascertain whether Mr. Salvato had advised Lentz to destroy any corroborating evidence of the murder-for hire plot. The government suspected this might have occurred because a search of Lentz's cell that same afternoon had failed to disclose certain documents relating to the murder-for-hire plot Jackmon claimed he had seen in Lentz's possession shortly before January 10, and because shortly after the telephone conversations, Lentz had abruptly canceled a meeting with an FBI undercover agent, posing as a "hit man," to discuss the plot. In fact, the telephone conversations do not reflect that Mr. Salvato directed Lentz to destroy any evidence.

counsel knew this was so. At the pretrial evidentiary hearing on this issue, Major Ted Hull, the assistant superintendent for the NNRJ, testified (i) that all outgoing telephone calls placed by inmates at NNRJ are placed through the same telephone system; (ii) that all such calls are subject to monitoring and recording; and (iii) that prior to connecting each outgoing call, the system plays a pre-recorded message, heard by both parties, stating that the call is subject to monitoring and recording.[3] Accordingly, NNRJ has a recording of all outgoing inmate calls, including those made by Lentz on the day in question and, prior to connecting the parties, both Lentz and his counsel received the pre-recorded message advising them that the call would be recorded and was subject to monitoring. Indeed, Lentz and his counsel essentially acknowledged as much during the course of their conversations.[4]

The content of the three telephone calls at issue merits a brief description. During the first call, Lentz asked Mr. Salvato what he knew about "a guy named Ridley [who] got murdered at the Springfield Mall." When Mr. Salvato inquired why this murder was relevant to Lentz's case, Lentz explicitly refused to answer. Immediately following this exchange, Lentz began to press Mr. Salvato for details about Jackmon.[5] In this regard, at one point Lentz explicitly stated to Mr. Salvato, "I'm asking you to certify some information. This is important." Presumably, what Lentz meant by this was that the purpose of his calls was to determine whether Jackmon had been telling Lentz the truth about being released from prison soon because a key witness in the case against Jackmon had been murdered. Lentz apparently believed that this murder was the handiwork of a "hit man" Jackmon had hired, and that the murder had taken place at Springfield Mall. During the third call, when Mr. Salvato inquired how Jackmon would be able to help Lentz, Lentz replied that Jackmon would be able to help Lentz secure a hit man "in case [Lentz] need[ed] something like that to happen in [his] case." The context of this statement leaves no doubt that the "something like that" to which Lentz referred was a murder-for-hire arrangement. Moreover, during these calls Lentz specifically directed Mr. Salvato not to call him by name, but to use an alias, "Bucks," instead. Over the course of these conversations, Mr. Salvato repeatedly asked Lentz if he was kidding about hiring a hit man. In response, Lentz stated that "[he doesn't] joke at 9 in the morning." Presumably to entice Mr. Salvato to empathize with him, Lentz stated that he was "sitting in the bowels of

**3.** Major Hull testified that owing to an inadvertent error by NNRJ's telephone service provider, toll-free calls placed from the jail to the Richmond and Alexandria Federal Public Defenders's (FPD) Offices from approximately October 2003 until May or June of 2005 were not preceded by this warning. Only calls from NNRJ to these FPD offices were affected by this error. Because none of the calls at issue were made to the FPD, the evidence is undisputed that each of the calls at issue was preceded a notice that calls were recorded and subject to monitoring. Accordingly, Lentz's claim, by counsel, that the warnings played "sporadically at best" is unsupported by the record.

**4.** In one instance, in response to a statement by Mr. Salvato concerning the hypothetical killing of a witness, the transcript of the call suggests that Lentz feigned ignorance on the matter, asking Mr. Salvato, "Why are you carrying on here? What if this thing was recorded?" In response, Mr. Salvato stated, "Oh, my God. All the [outgoing inmate] phone calls are recorded Jay. . . . They're all recorded."

**5.** During the course of these telephone calls, Lentz apparently became aware that Mr. Salvato had previously represented Jackmon.

hell," that he was "at the end of his rope," and that "[he's] gotta do what [he's] gotta do to survive."

In sum, the three calls in question focus chiefly on whether Jackmon could be trusted regarding Lentz's possible use of a hit man to murder witnesses and perhaps a prosecutor prior to his forthcoming retrial. The contents of these calls, taken as a whole, invite the inference that Lentz was seriously considering a murder-for-hire plot, and was calling Mr. Salvato to inquire about Jackmon's reliability with respect to information Jackmon had provided Lentz about his own case.[6]

On May 19, 2005, the government filed an *ex parte*, under seal motion seeking an order permitting the government team investigating the taped calls to disclose the transcripts of those calls as well as the recordings of the calls themselves, to both the prosecutors assigned to conduct the *Lentz* retrial and the team of prosecutors investigating the murder-for-hire plot.[7]

That motion was denied, and the government was directed instead to deliver promptly to defense counsel a copy of the government's under seal motion and its attachments, which included the telephone call transcripts. *See United States v. Lentz*, Case No. 1:01cr150 (E.D.Va. May 20, 2005) (Order).[8] Lentz was then allowed a period of time to investigate the matter, after which he moved, by counsel, to suppress all transcripts and recordings of his telephone conversations with his attorney. In Lentz's view, the telephone calls and their contents (i) are protected by the attorney-client privilege; and (ii) were illegally obtained in violation of his Sixth Amendment rights. The issue, then, is whether either the attorney-client privilege or Lentz's Sixth Amendment right to counsel precludes the government from using the contents of these telephone conversations for any purpose, including offering them at the retrial as evidence of Lentz's consciousness of guilt with respect to Doris' murder.[9]

---

**6.** The transcripts make clear that Mr. Salvato discouraged Lentz from pursuing any murder-for-hire plot.

**7.** In the circumstances and given the nature of both Jackmon's allegations and the recorded telephone calls, the government appropriately established, in addition to the existing trial team of prosecutors, a second and distinct team of prosecutors to investigate the murder-for-hire plot, as well as a third team to review the telephone call recordings. The government also appropriately took steps to ensure that the trial team was not informed of either Jackmon's allegations concerning the murder-for-hire plot by Lentz or the tape recordings of Lentz's telephone calls to his attorney. Additionally, the government also took steps to ensure that access to the telephone recordings was restricted to the third team.

**8.** Additionally, the parties and counsel were directed to file all pleadings and briefs related to the alleged murder-for-hire plot under seal, and to treat all aspects of the proceedings as sealed. Of course, as a general rule, judicial

records and proceedings should be public and accessible to the public, unless compelling circumstances require otherwise. *See Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597–98, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (stating that judicial records and documents are generally available to the public); *Media General Operations, Inc. v. Buchanan*, 417 F.3d 424 (4th Cir.2005) (same). In this case, however, a departure from this general rule is warranted to avoid publicity that might taint the jury pool as news of an alleged murder-for-hire plot might do. *See In the Matter of Application and Affidavit for a Search Warrant*, 923 F.2d 324, 332 (4th Cir. 1991) (upholding magistrate judge's decision to seal pretrial proceedings "to protect a fair trial from untoward prejudicial pretrial publicity").

**9.** *See, e.g., United States v. Van Metre*, 150 F.3d 339, 352 (4th Cir.1998) (stating that evidence of solicitation to kill witnesses is admissible as consciousness of guilt evidence).

## II.

Few principles of law are as well-settled as the attorney-client privilege; it is a bedrock principle of the adversary system.[10] In essence, the privilege's purpose is to encourage full and frank communication between attorneys and clients by according court-enforced protection against disclosure of such communications when the client invokes the privilege.[11] The privilege recognizes that sound legal advice and informed advocacy serves the public interest, that such advice or advocacy depends upon the lawyer's being fully informed by the client, and that this occurs only where the client feels secure that communications with counsel will not be disclosed. *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). *See also Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980) ("The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out."); *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) (stating that the attorney-client privilege encourages full disclosure by clients to their attorneys).

 While recognizing the fundamental importance of the privilege, courts have nonetheless been careful not to stretch its application to circumstances beyond its rationale. This is so because the attorney-client privilege, like all privileges, "impedes [the] full and free discovery of the truth," and is "in derogation of the public's 'right to every man's evidence.'" *In re Grand Jury Proceedings,* 727 F.2d 1352, 1355 (4th Cir.1984) (quoting *Weil v. Investment/Indicators, Research & Management, Inc.,* 647 F.2d 18, 24 (9th Cir.1981)). Accordingly, courts carefully construe the privilege to apply only to those situations in which the party invoking the privilege consulted an attorney for the purpose of securing a legal opinion or services, and in connection with that consultation, communicated information intended to be kept confidential. *See In re Grand Jury Proceedings,* 727 F.2d at 1355; *United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir. 1982). Thus, in this circuit and elsewhere, the boundaries of the attorney-client privilege are clearly demarcated and well-settled. The privilege applies only if:

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not

---

**10.** *See generally, Developments in the Law—Privileged Communications,* 98 HARV. L. REV. 1454 (1985) (discussing policy justifications underlying the attorney-client privilege).

**11.** The privilege belongs to the client, not the attorney. *See In re: Grand Jury Proceedings # 5,* 401 F.3d 247, 250 (4th Cir.2005); *Hawkins v. Stables,* 148 F.3d 379, 384 n. 4 (4th Cir.1998). Generally, the attorney-client privilege arises under the rubric of Rule 501, Fed.

R.Evid. This rule provides that "the privilege of a witness, person, government, state, or political subdivision thereof shall be governed by the principles of common law as they may be interpreted by the courts of the United States in light of reason and experience." The attorney-client privilege is the oldest witness privilege recognized under common law. *See* 8 J. Wigmore, Evidence § 2290.

waived by the client. *Jones,* 696 F.2d at 1072 (4th Cir.1982).[12]

And importantly, the burden is on the proponent of the attorney-client privilege to demonstrate its applicability.[13] Specifically, the proponent must establish "not only that an attorney-client relationship existed, but also that the particular communications at issue are privileged and that the privilege was not waived." *In re Grand Jury Subpoena,* 341 F.3d 331, 335 (4th Cir.2003).[14] And, it is also well-settled that a client waives the attorney-client privilege by voluntarily disclosing otherwise privileged communications to a third party.[15] In fact, this requirement of confidentiality is so central to any claim of privilege that the privilege may be lost even by an inadvertent disclosure to a third party. *See In re Grand Jury Proceedings,* 727 F.2d at 1356 (holding that

the privilege is lost where the party did not take "reasonable steps to insure and maintain [the] confidentiality [of the communications.]"); *see also id.* (noting that the presence of eavesdroppers in certain circumstances may destroy the privilege). Waiver need not be explicit; the client waives the privilege by conduct "which implies a waiver of the privilege or a consent to disclosure." *U.S. v. Dakota,* 197 F.3d 821, 825 (6th Cir.1999); *In re von Bulow,* 828 F.2d 94, 104 (2d Cir.1987) (same). *See also Hanson v. U.S. Agency for Intern. Development,* 372 F.3d 286, 293–94 (4th Cir.2004) ("A client can waive an attorney-client privilege expressly or through his own conduct.").

■■■ These principles, applied here, compel the conclusion that an inmate's telephone conversations with counsel are

---

**12.** *See also In re Grand Jury Subpoena: Under Seal,* 415 F.3d 333, 2005 WL 1663786 (4th Cir.2005); *In re Grand Jury Subpoena,* 341 F.3d 331, 335 (4th Cir.2003); *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950).

**13.** *In re Grand Jury Subpoena: Under Seal,* 415 F.3d 333 (4th Cir.2005) (stating that the party asserting the privilege bears the burden of proof that the privilege applies); *In re Grand Jury Subpoena,* 341 F.3d 331, 335 (4th Cir.2003) (same); *Hawkins,* 148 F.3d at 383 (quoting *United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982)) (same); *Weil v. Investment/Indicators, Research & Management, Inc.,* 647 F.2d 18, 25 (9th Cir.1981) (same); *Federal Trade Commission v. TRW, Inc.,* 628 F.2d 207, 213 (D.C.Cir.1980) (same); *Bouschor v. United States,* 316 F.2d 451, 456 (8th Cir.1963) (same).

**14.** *See also Sheet Metal Workers Intern. Ass'n v. Sweeney,* 29 F.3d 120, 125 (4th Cir.1994) (citing proponent's burden); *United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982) (same); *United States v. Bump,* 605 F.2d 548, 551 (10th Cir.1979) (same); *United States v. Stern,* 511 F.2d 1364, 1367 (2d Cir.1975) (same); *In re Horowitz,* 482 F.2d 72, 81–82 (2d Cir.1973) (same).

**15.** *Sheet Metal Workers Intern. Ass'n v. Sweeney,* 29 F.3d 120, 125 (4th Cir.1994) ("Any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the attorney-client privilege. Any voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter."); *U.S. v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982) (same); *In re Grand Jury Proceedings,* 727 F.2d 1352, 1355–56 (4th Cir.1984) ("It is of the essence of the privilege that it is limited to those communications which the client either expressly made confidential or which he could reasonably assume under the circumstances would be understood by the attorney as so intended."); *In re Grand Jury Proceedings,* 78 F.3d 251, 254 (6th Cir.1996) (noting that, by voluntarily disclosing confidential communications to a third party, a client waives the privilege because such disclosure "runs counter to the notion of confidentiality"); *Westinghouse Elec. Corp. v. Republic of the Philippines,* 951 F.2d 1414, 1424 (3rd Cir.1991) ("[V]oluntary disclosure to a third party of purportedly privileged communications has long been considered inconsistent with an assertion of the privilege.").

not protected by the attorney-client privilege where, as here, the inmate is notified at the outset that the calls are recorded and subject to monitoring. In these circumstances, Lentz could not reasonably have assumed that his conversations with Mr. Salvato would be confidential. His decision to proceed with the conversations, despite notification that the conversations were being recorded and were subject to monitoring, is no different from Lentz electing to proceed with these conversations notwithstanding the known presence of a third party within earshot of the conversation.[16]

The Fourth Circuit has not yet squarely addressed the question whether inmates waive any privilege protection for telephone conversations when they choose to proceed with these conversations in the face of notice that the calls are being recorded and subject to monitoring. Significantly, however, the three circuits that have done so have uniformly held that such notice destroys any expectation of privilege.[17] Particularly instructive in this regard is the Eight Circuit's opinion in *United States v. Hatcher*, in which the panel held that:

> The presence of the prison recording device destroyed the attorney-client privilege. Because the inmates and their lawyers were aware that their conversations were being recorded, they could not reasonably expect that their conversations would remain private. The presence of the recording device was the functional equivalent of the

16. Nor is it persuasive to argue, as Lentz does, that Mr. Salvato told him that their conversations were privileged, because the monitoring and recording notice that preceded each of the calls destroyed any reasonable expectation of privilege. During the third call, Mr. Salvato stated to Lentz that "this is a privileged call, but they're all recorded." Mr. Salvato's suggestion that the attorney-client privilege would apply to a call that was being recorded by a third party is simply mistaken and cannot serve to rescue the waived privilege. What is more, it is clear from the contents of these calls that Lentz understood that the calls were recorded, which confirms the waiver. *See supra* note 4. Even assuming that Mr. Salvato's erroneous advice with respect to privilege relieved Lentz's concern regarding the NNRJ's recording and monitoring of the calls, it is worth noting that Lentz made many of the incriminating statements at issue prior to Mr. Salvato's mistaken statement. Thus, Lentz cannot claim that any such statement was induced by Mr. Salvato's misstatement, nor would it matter had it been otherwise, for it is simply unreasonable for Lentz to believe the conversations would remain private. *See United States v. Dornau*, 491 F.2d 473, 480–81 (2d Cir.1974) (upholding admission of defendant's incriminatory statements over defendant's objection that the statements were induced by a mistaken "express assurance" from his counsel regarding

their admissibility); *United States v. Mendelsohn*, 896 F.2d 1183, 1188–89 (9th Cir.1990) (upholding district court's conclusion that defendant waived the attorney-client privilege by making certain incriminatory statements to authorities, even though defendant's attorney allegedly told defendant that the conduct at issue was not illegal)

17. *United States v. Hatcher*, 323 F.3d 666, 674 (8th Cir.2003) (holding that prisoners and their attorneys had no reasonable expectation of privacy since they knew their conversations were being recorded); *United States v. Madoch*, 149 F.3d 596, 602 (7th Cir.1998) (holding that the marital communications privilege did not apply where the wife knew that her husband was in jail in light of the "well-known need for correctional institutions to monitor inmate conversations"); *United States v. Sababu*, 891 F.2d 1308, 1329 (7th Cir.1989) (stating that non-prisoner caller had no reasonable expectation of privacy when speaking on prison phone in part because the Code of Federal Regulations placed her on constructive notice that prison officials could legally monitor calls); *United States v. Harrelson*, 754 F.2d 1153, 1169–70 (5th Cir.1985) (stating that interspousal communications privilege during prison visit were not privileged where eavesdropping could reasonably be expected to occur).

presence of a third party. These conversations were not privileged. *Hatcher*, 323 F.3d at 674.

Similarly, Lentz here could not "reasonably expect that ... [his] conversations would remain private." *Id.* It follows that Lentz's recorded conversations with his attorney, like the recorded conversations in *Hatcher*, were not privileged. Lentz attempts to distinguish *Hatcher* on the ground that the monitoring notice at NNRJ was not played before all calls and that, as a result, he reasonably believed that his calls to Mr. Salvato were confidential or protected by the privilege. This argument fails. Contrary to Lentz's argument, the record establishes that, with only one exception not relevant here,[18] the NNRJ system automatically and unfailingly provided the recording and monitoring notice before each call was connected, and that this occurred with respect to the three calls at issue here. Thus, Lentz and Mr. Salvato received the notice before each of the three calls and Lentz's decision to proceed with the conversations under these circumstances constituted a waiver of the attorney-client privilege. *See U.S. v. Dakota*, 197 F.3d 821, 825 (6th Cir.1999) (stating that client's waiver of privilege can be implied from conduct inconsistent with the assertion of that privilege); *In re von Bulow*, 828 F.2d 94, 104 (2d Cir.1987) (same); *Hanson*, 372 F.3d at 293–94 (4th Cir.2004) (same). Moreover, as noted previously, Lentz's concern that the calls might be recorded suggests that he did not, in fact, believe that the calls were privileged.[19] If Lentz truly believed that his conversations with Mr. Salvato were privileged, then he would have been unconcerned about any possible recording, since it would be inadmissible.[20]

In sum, then, the notice at the beginning of each call, as well as Lentz's statements during the calls, make clear that Lentz could not reasonably have expected the conversations to be confidential. Accordingly, the telephone calls between Lentz and Mr. Salvato are not privileged.

### III.

A separate and independent ground for the result reached here is the well-established crime fraud exception to the attorney-client privilege. Thus, assuming, *arguendo*, that Lentz had a reasonable expectation that his conversations with Mr. Salvato would be confidential, they nonetheless would not be privileged because communications made for an unlawful purpose or to further an illegal scheme are not privileged.[21] The crime-fraud exception applies only to communica-

---

**18.** *See supra* note 3.

**19.** *See supra* note 4 (noting that Lentz feigned ignorance to Mr. Salvato's questions concerning the hypothetical murder of a witness, stating, "Why are you carrying on here? What if this thing was recorded?").

**20.** Lentz's request that Mr. Salvato call him by a false name is further evidence that Lentz was aware that the calls were recorded and monitored.

**21.** *See Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933) ("A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told."); *see also U.S. v. Zolin*, 491 U.S. 554, 556, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) ("The attorney-client privilege does not apply when a client's communications with an attorney will not be privileged 'if made for the purpose of committing or furthering a crime or fraud.'"); *In re Grand Jury Proceedings # 5*, 401 F.3d 247, 251 (4th Cir.2005) ("Both the attorney-client and work product privileges may be lost, however, when a client gives information to an attorney for the purpose of committing or furthering a crime or fraud."); *In re Grand Jury Proceedings, Thursday Special Grand Jury*, 33 F.3d 342, 348 (4th Cir.1994) ("The crime-fraud exception to the attorney-client privilege pro-

tions about ongoing or future activities.[22] Communications concerning past crimes or frauds are privileged unless the privilege has otherwise been waived. *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1041 (2nd Cir.1984) (stating that communications with respect to past frauds are privileged); *X Corp.*, 805 F.Supp. at 1307 (same).

The rationale for the crime-fraud exception is closely tied to the policies underlying the attorney-client privilege. Whereas confidentiality of communications facilitates the rendering of sound legal advice, which is to be encouraged, it cannot be said that advice in furtherance of a fraudulent or unlawful goal is sound, nor is it to be encouraged. Rather, advice in furtherance of such goals is anathema to our system of justice; hence, a client's communications seeking such advice are not worthy of protection.[23] It is immaterial whether the attorney knew that the client was seeking his advice for illegal purposes or whether the attorney joined in, or, as here, counseled against the illegal activity. The attorney's knowledge and intent are not material to the operation of the crime fraud exception; only the client's knowledge and intent are material in this regard.[24] It is similarly immaterial whether the defendant actually succeeded in completing the crime or fraud in question; rather, solicitation alone triggers the exception. *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1039 (2d Cir.1984) ("The crime or fraud need not have occurred for the exception to be applicable; it need only have been the objective of the client's communication.").

vides that a client's communications with an attorney will not be privileged if made for the purpose of committing or furthering a crime or fraud."); *In re Grand Jury Proceedings*, 727 F.2d 1352, 1355 (4th Cir.1984) ("The privilege applies only when the person claiming the privilege has as a client consulted an attorney for the purpose of securing a legal opinion or services and not 'for the purpose of committing a crime or tort.' "); *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1038 (2d Cir.1984); ("It is well-established that communications that otherwise would be protected by the attorney-client privilege or the attorney work product privilege are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct."); *Union Camp Corp. v. Lewis*, 385 F.2d 143, 144 (4th Cir.1967) (holding that the attorney-client privilege was withdrawn where lawyer's advice was designed to serve his client in commission of a fraud or crime); *see generally* 31 A.L.R.4th 458, 460–61; 81 Am. Jur.2d, Witnesses §§ 207–208.

**22.** *In re Sealed Case*, 124 F.3d 230, 234 (D.C.Cir.1997); *X Corp. v. Doe*, 805 F.Supp. 1298, 1307 (E.D.Va.1992).

**23.** *See In re International Systems and Controls Corp.*, 693 F.2d 1235, 1242 (5th Cir. 1982) ("The rationale for [the attorney-client privilege] is that the client, given the nature of our adversary system, has a legitimate interest in securing informed representation without fear of forced disclosure. However, the client has no legitimate interest in seeking legal advice in planning future criminal activities."); *In re Sealed Case*, 676 F.2d 793, 812 (D.C.Cir.1982) (noting that extension of the attorney-client privilege to attorney work product in furtherance of criminal or fraudulent activity is "fundamentally inconsistent with the basic premises of the adversary system").

**24.** *See In re Grand Jury Proceedings # 5*, 401 F.3d at 251 ("When applying the crime-fraud exception to the attorney-client privilege, we have held that it is the client's knowledge and intentions that are of paramount concern.... Therefore, for the exception to apply, the attorney need not be aware of the illegality involved. Rather, it is enough that the communication furthered, or was intended by the client to further, that illegality."); *In re Grand Jury Proceedings*, 680 F.2d 1026, 1028 (5th Cir.1982) (citing *United States v. Friedman*, 445 F.2d 1076, 1086 (9th Cir.1971)) ("The crime or fraud exception applies even where the attorney is completely unaware that his advice is sought in furtherance of an improper purpose.").

 The party asserting the crime-fraud exception to the privilege-here, the government-bears the burden to establish a prima facie case that the communications in question fall outside the scope of the privilege. *In re Grand Jury Proceedings # 5,* 401 F.3d at 251; *Chaudhry v. Gallerizzo,* 174 F.3d 394, 403 (4th Cir.1999). To overcome an established privilege using the crime-fraud exception, the government must show that the communications (i) were made for an unlawful purpose or to further an illegal scheme and (ii) reflect an ongoing or future unlawful or illegal scheme or activity. Importantly, the purported crime or fraud need not be proved either by a preponderance or beyond a reasonable doubt. Rather, the proof "must be such as to subject the opposing party to the risk of non-persuasion of the evidence as to the disputed fact is left unrebutted." *See Union Camp Corp.,* 385 F.2d at 144–45.[25] Finally, when making its prima facie showing, the government is not limited to admissible evidence; it may rely on any relevant evidence, including hearsay, that has been lawfully obtained that is not otherwise privileged.[26]

These principles, applied here, make clear that the government has made a prima facie showing that the crime-fraud exception applies to the conversations in question. In this case, the contents of the telephone calls, viewed as a whole, leave no doubt that Lentz's primary purpose in calling Mr. Salvato was to discuss Lentz's murder-for-hire plot. Specifically, Lentz sought to corroborate certain things that Jackmon had told him, including (i) whether Jackmon's release from prison was imminent and (ii) whether Jackmon's release was related to the murder of a witness in his case. When Mr. Salvato asked Lentz why this was relevant, Lentz replied that Jackmon might help him "in case [Lentz] needed something like that to happen on [his] case." The conversations in general, and this comment in particular, leave no doubt that Lentz's purpose in calling Mr. Salvato was to get information that would assist Lentz in the planning and carrying out the murder-for-hire plot.

In sum, then, Lentz called Mr. Salvato in order to assess the validity of what Jackmon had told him, which would in turn help Lentz decide whether he should continue to trust Jackmon and involve Jackmon in the planning and/or execution of Lentz's murder-for-hire plot. Accordingly, there can be little doubt that Lentz, in contacting Mr. Salvato, was seeking aid and information from his attorney to further his nascent murder-for-hire plot.[27]

25. *In re Grand Jury Subpoenas 89–3 and 89–4,* 734 F.Supp. 1207, 1215; *Clark,* 289 U.S. at 15, 53 S.Ct. 465; *X Corp.,* 805 F.Supp. at 1307; *In re Grand Jury Proceedings,* 401 F.3d at 251; *In re Grand Jury Proceedings, Thursday Special Grand Jury,* 33 F.3d 342, 352 (4th Cir.1994) (articulating the burden of the party seeking to invoke the crime-fraud exception); *Duplan Corp. v. Deering Milliken, Inc.,* 540 F.2d 1215, 1220 (4th Cir.1976) (same).

26. *Zolin,* 491 U.S. at 575, 109 S.Ct. 2619; *In re Grand Jury Subpoena,* 884 F.2d 124, 127 (4th Cir.1989); *In re Grand Jury Proceedings,* 674 F.2d 309, 310 (4th Cir.1982) (permitting the use of the grand jury testimony of an IRS agent to make the prima facie case for the crime-fraud exception).

27. Lentz argues the government cannot meet this first element of the crime-fraud exception because Lentz "never took proactive steps to plan a crime, and any plans that were made were made by Jackmon." Even assuming that Lentz was simply along for the ride in a scheme solely concocted by Jackmon, the disjunctive phrasing of the standard indicates that the government can still meet its burden by showing only that Lentz was "engaged in" a criminal or fraudulent scheme. *See In re Grand Jury Proceedings # 5,* 401 F.3d at 251 ("[T]he party invoking the crime-fraud exception must make a prima facie showing that the client was engaged in *or* planning a criminal or fraudulent scheme....") (emphasis added).

Given that the government has more than met its burden to show that the calls at issue fall within the crime-fraud exception, it falls to Lentz to rebut this showing. He has failed to do so; he offers no plausible justification or argument for why the conversations at issue should escape the crime-fraud exception to the privilege.[28] Therefore, because the crime-fraud exception strips the conversations at issue of any privilege protection, the contents of the calls between Lentz and Mr. Salvato would not be protected by the privilege even had they been confidential.

## IV.

Quite apart from Lentz's privilege claim, he advances two Sixth Amendment claims to prevent the government's disclosure and use of the recorded telephone conversations. First, Lentz claims that his statements during the telephone calls were improperly elicited by the government through its agent, Jackmon, in violation of Lentz's Sixth Amendment right to counsel. Second, he claims that the NNRJ's policy of tape recording all outgoing calls constitutes a denial of his right to counsel, since the monitoring effectively prevented Lentz from conferring confidentially with his attorney. Both claims fail.

■ *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and its progeny hold that the Sixth Amendment prohibits the government from deliberately eliciting incriminating evidence from an accused "after he ha[s] been indicted and in the absence of his counsel." *Massiah*, 377 U.S. at 206, 84 S.Ct. 1199. *See also Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986); *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). *Massiah* teaches that courts must apply a two-part test to determine if an informant's conduct violates a defendant's Sixth Amendment rights. In this regard, the defendant must show that (i) the informant was acting as a government agent and (ii) the informant deliberately elicited the incriminating statements from the defendant.[29] This test remains the same regardless of whether the person being interrogated knows that he is speaking to a government agent.[30] As noted in a Memorandum Opinion of even date focusing on Lentz's Sixth Amendment objections relating to Jackmon's testimony,[31] Jackmon was functioning as a government agent at the time Lentz made the statements at issue. Accordingly, Lentz has carried his burden with respect to the first element of the *Massiah* test. There is no record evidence, however, to suggest that Jackmon

**28.** Lentz argues that his only purpose in calling Mr. Salvato was to report that he had learned that Jackmon had crafted a plot to murder witnesses and/or counsel in Lentz's case, and that Lentz wanted Mr. Salvato's advice about how he should proceed in the face of this uninvited and unwanted intrusion. For the reasons discussed *infra*, Lentz's explanation is unpersuasive.

**29.** *Massiah*, 377 U.S. at 206, 84 S.Ct. 1199 (articulating test); *Fellers v. U.S.*, 540 U.S. 519, 524, 124 S.Ct. 1019, 157 L.Ed.2d 1016 (2004) (same); *Sweat v. Arkansas*, 469 U.S. 1172, 1179, 105 S.Ct. 933, 83 L.Ed.2d 944

(1985) (same); *Henry*, 447 U.S. at 270, 100 S.Ct. 2183 (same).

**30.** *Sweat*, 469 U.S. at 1179, 105 S.Ct. 933 (quoting *Henry*, 447 U.S. at 272–273, 100 S.Ct. 2183 ("[We] have rejected suggestions that we 'apply a less rigorous standard under the Sixth Amendment where the accused is prompted by an undisclosed undercover informant than where the accused is speaking in the hearing of persons he knows to be Government officers.' ")).

**31.** *See United States v. Lentz*, Case No. 1:01cr150 (E.D.Va. August 22, 2005) (Order).

deliberately elicited the statements in question; rather, the evidence convincingly reflects that Lentz made the statements freely and voluntarily. As the admission of Lentz's voluntary statements presents no Sixth Amendment problems,[32] Lentz argument that his statements were deliberately elicited by Jackmon in violation of *Massiah* fails.[33]

Lentz differs sharply, arguing that Jackmon, working at the direction of Special Agent Bradley Garrett, befriended Lentz and engaged him in numerous conversations in an attempt to elicit incriminating statements from Lentz regarding Doris' murder. Having obtained his confidence and trust, Lentz argues, Jackmon fabricated a story about knowing a "hit man" who could eliminate witnesses and/or opposing counsel. Lentz further argues that the murder-for-hire plot was entirely Jackmon's own creation, and that Lentz did not participate in any aspect of its planning. Lentz maintains that his calls to Mr. Salvato were prompted solely by Jackmon's attempt "to intervene" in Lentz's case.[34] Accordingly, Lentz claims that he sought the advice of his attorney about how to proceed in the face of Jackmon's unsolicited meddling.

Lentz's version of events is flatly contradicted by the contents of the telephone calls. The notion that Jackmon would, without prompting, take it upon himself to concoct a murder-for-hire plot in an unrelated case of another inmate whom he had only recently met defies rational explanation. Moreover, the contents of these conversations contradict Lentz's

---

**32.** The Sixth Amendment does not prevent the admission of a defendant's voluntary statements. *See Michigan v. Harvey*, 494 U.S. 344, 353, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990) ("Although a defendant may sometimes later regret his decision to speak with police, the Sixth Amendment does not disable a criminal defendant from exercising his free will."); *Rhode Island v. Innis*, 446 U.S. 291, 299–300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (quoting *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694, (1966) (stating that, in the context of the Fifth Amendment, "[v]olunteered statements of any kind are not barred. . . .")); *U.S. v. Wright*, 991 F.2d 1182, 1186 (4th Cir. 1993) (stating that statements that a defendant's "voluntary and spontaneous" statements were admissible); *U.S. v. Seidman*, 156 F.3d 542, 549 (4th Cir.1998) (noting that, in the context of the Fourth Amendment, "consent has often been recognized as sufficient to waive [constitutional] rights"); *Valdez v. Ward*, 219 F.3d 1222, 1235 (10th Cir.2000) (upholding decision that defendant waived his Sixth Amendment right to counsel when he made "spontaneous and unsolicited" incriminating remarks); *U.S. v. Montana*, 958 F.2d 516, 519 (2d Cir.1992) (holding that a "spontaneous and unsolicited declaration" by defendant was admissible); *Gilreath v. Mitchell*, 705 F.2d 109, 110 (4th Cir.1983) (upholding admission of defendant's statement as voluntary and not as the result of "improper interrogation which puts words into the mouth of the accused and overrides his free will").

**33.** Nor does the argument that Jackmon planted the idea for a murder-for-hire plot in Lentz's mind while acting as a government agent prove deliberate elicitation. Assuming *arguendo* that this is true, the statements at issue were sufficiently attenuated from this initial taint to qualify as an act of Lentz's free, and are therefore admissible. *See United States v. Gray*, 137 F.3d 765, 779 (4th Cir. 1998) (admitting statements where "intervening events break causal connection between the illegal government conduct and the incriminating statement") (quoting *Taylor v. Alabama*, 457 U.S. 687, 690, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982)); *see also Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (establishing a three-part balancing test to determine if defendant's actions are the product of his exercise of free will).

**34.** Although Lentz does not say so explicitly, the intervention to which he refers presumably means that Jackmon was taking steps to engage a "hit man" to murder witnesses and/or opposing counsel in Lentz's case.

suggestion that he was only relaying information about a murder-for-hire plot which he had no role in creating. Had Lentz merely wanted to report Jackmon's actions, he could have informed Mr. Salvato that he had become aware of Jackmon's plot, and that he wanted no part of it. Several of Lentz's statements during these three separate calls, which together lasted more than 30 minutes, suggest, if not make clear, that he was quite interested in proceeding with the plot.[35] In sum, the record does not support, and indeed contradicts, Lentz's argument that Jackmon deliberately elicited Lentz's statements in question. This Sixth Amendment claim is meritless.

■ Lentz's second Sixth Amendment claim is that the NNRJ's policy of tape recording all outgoing calls constitutes a denial of his right to counsel, since the monitoring effectively prevented Lentz from conferring confidentially with his attorney. The essential purpose of the Sixth Amendment is to ensure that criminal defendants have the requisite assistance of counsel thought to be necessary to a fair trial.[36] The Sixth Amendment does not, however, afford any protection to criminal defendants who seek to carry out, through counsel, an unlawful course of conduct.

*Georgia v. McCollum,* 505 U.S. 42, 58, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); *Nix v. Whiteside,* 475 U.S. 157, 166, 106 S.Ct. 988, 89 L.Ed.2d 123, (1986); *Zolin,* 491 U.S. at 562–563, 109 S.Ct. 2619.

These principles compel the conclusion that the conversations at issue are not entitled to Sixth Amendment protection. As noted previously, the contents of the telephone calls, viewed as a whole, make clear that Lentz's primary purpose in calling Mr. Salvato was obtain information from Mr. Salvato that would allow Lentz to assess whether he should continue to trust Jackmon and/or involve him in further planning or execution of the murder-for-hire plot. It would be a perverse conception of the Sixth Amendment if the right to a fair trial included the right to seek the assistance of counsel regarding the planning and solicitation of the murder of witnesses and opposing counsel in that trial. Accordingly, the Supreme Court has made clear that such conduct is not entitled to any protection under the Sixth Amendment. *McCollum,* 505 U.S. at 58, 112 S.Ct. 2348; *Nix,* 475 U.S. at 166, 106 S.Ct. 988; *Zolin,* 491 U.S. at 562–563, 109 S.Ct. 2619.

■ Lentz argues that the NNRJ's across-the-board policy of recording all

---

**35.** Lentz's articulated motives include: (i) that he had been "locked up too long"; (ii) that he was "sitting in the bowels of hell"; (iii) that he was "at the end of his rope," and (iv) that "[he's] gotta do what [he's] gotta do to survive."

**36.** *Nichols v. United States,* 511 U.S. 738, 754–55, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994); *Strickland v. Washington,* 466 U.S. 668, 684, 104 S.Ct. 2052, 80 L.Ed.2d 674, (1984) (holding that the Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial"); *Nix v. Whiteside,* 475 U.S. 157, 175, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) (noting that under *Strickland,* the "benchmark" of the right to counsel is the "fairness of the adversary pro-

ceeding"); *United States v. Cronic,* 466 U.S. 648, 653, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) ("Without counsel, the right to a trial itself would be of little avail.") (internal quotation marks and footnote omitted); *United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981) (stating that the right to counsel "is meant to assure fairness in the adversary criminal process"); *Lockhart v. Fretwell,* 506 U.S. 364, 368, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (quoting *Cronic,* 466 U.S. at 658, 104 S.Ct. 2039) (noting that the right to counsel is venerated "not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial").

outgoing inmate calls (to attorneys and non-attorneys alike) impermissibly impairs his ability to confer with his attorneys. Consequently, Lentz argues, the government cannot now turn around and use the fruit of this illegal conduct against him. The issue, therefore, is whether the NNRJ's policy of recording all outgoing inmate calls constitutes an effective denial of Lentz's Sixth Amendment rights in light of (i) the important penological interests that this policy serves and (ii) the existence of other means available to Lentz at NNRJ to communicate confidentially with his attorney.

It is undisputed that the NNRJ's policy of taping outgoing calls from inmates serves important penological interests; namely, deterring inmates from using the telephone in furtherance of criminal activity inside and outside the jail, and detecting, preventing, and prosecuting such activity when it does occur. Additionally, Lentz does not argue that his calls were singled out for special scrutiny; he correctly concedes that the policy at issue applied equally to all inmates. He maintains, however, that because the NNRJ does not exempt from monitoring calls by inmates to their attorneys, Lentz cannot have a confidential call with his attorneys, which, he argues, constitutes an undue infringement of his Sixth Amendment rights.[37]

Prison officials, exercise "wide discretion" in determining the manner and method that inmates will be allowed to access the court system and their attorneys; prisoners are not entitled to any particular method of access to the courts or to their lawyers. *Bounds v. Smith,* 430 U.S. 817, 833, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).[38] As long as prison policies in this respect are not constitutionally deficient, courts are not at liberty to disturb them. *Pino v. Dalsheim,* 558 F.Supp. 673, 675 (S.D.N.Y. 1983) ("So long as the State's procedure's [sic] meet constitutional minima, the courts should not second-guess them.").

These principles, applied here, make clear that the NNRJ's practice of recording and monitoring all inmate telephone calls does not violate Lentz's Sixth Amendment rights. A different result would doubtless obtain were NNRJ to block all avenues of effective contact with counsel; such conduct by prison officials would contravene the Sixth Amendment. But the fact is that this is not such a case; NNRJ does not prevent inmates from conferring confidentially with counsel. Specifically, Lentz and other NNRJ inmates have at least two effective avenues of communicating confidentially with counsel-mail and in-person conferences. First, inmates at NNRJ may have unlimited outgoing and incoming correspondence with their attorneys. This correspondence may be screened for contraband, but is not read or otherwise monitored. Similarly, NNRJ in-

---

**37.** The record reflects that there is no practical way for the jail to know in advance whether the inmate has dialed an attorney or not, given the large number of inmates at NNRJ as well as the large number of attorneys whom they might contact.

**38.** *See also Bellamy v. McMickens,* 692 F.Supp. 205, 214 (S.D.N.Y.1988) ("States have no obligation to provide the best manner of access to counsel. Rather, restrictions on inmates' access to counsel via the telephone may be permitted as long as prisoners have

some manner of access to counsel."); *Aswegan v. Henry,* 981 F.2d 313, 314 (8th Cir. 1992) ("Although prisoners have a constitutional right of meaningful access to the courts, prisoners do not have a right to any particular means of access, including unlimited telephone use."); *Pino v. Dalsheim,* 558 F.Supp. 673, 675 (S.D.N.Y.1983) (noting that the government is not required to provide inmates the best manner of access to counsel).

mates may confer confidentially with their attorneys at NNRJ. These conferences are neither recorded nor monitored. Of course, counsel must travel 90 miles from Alexandria to NNRJ to meet and confer with Lentz, but they are compensated at the statutory hourly rate for their travel time and are reimbursed for their travel expenses as well.[39]

To be sure, telephone communications might well be more convenient for counsel, but NNRJ is not constitutionally compelled to provide Lentz with the most convenient or his preferred mode of conferring with his attorney. *See Bellamy v. McMickens,* 692 F.Supp. at 214 (noting that the government need not provide the best manner of access to counsel); *Aswegan,* 981 F.2d at 314 (same); *Dalsheim,* 558 F.Supp. at 675 (same). Instead, NNRJ officials must have discretion to strike a proper balance between providing reasonable avenues for inmate-attorney confidential communications and accommodating the important penological interests in detecting and thwarting inmate criminal conduct carried out in part by telephone calls.[40] This record reflects that NNRJ has not abused its discretion in striking this balance,[41] and the NNRJ policy of recording and monitoring all inmate telephone calls does not infringe Lentz's Sixth Amendment rights.

In sum, therefore, the record evidence does not support the conclusion that the telephone calls at issue on January 10, 2005 between Lentz and Mr. Salvato should be suppressed under either the attorney-client privilege or the Sixth Amendment right to counsel. Accordingly, defendant's motion to suppress the recordings of the telephone calls and to preclude their disclosure to the government's trial team must be denied, and the government may now disclose the recordings and the associated transcripts both to the team investigating the alleged murder-for-hire plot, and to the trial team. Importantly, however, all prosecutors on all three teams, as well as all defense counsel and defendant, are directed to treat as sealed all matters relating to the alleged murder-for-hire plot until further Order of the Court.

An appropriate Order will issue.

---

**39.** *See* 18 U.S.C. § 3006(A)

**40.** There is ample evidence showing that inmates use prison phones to conduct criminal activities. *See generally,* Telephone Regulations and Inmate Financial Responsibility, 59 Fed.Reg. 15,812, 15,813–14 (Apr. 4, 1994) (noting that one impetus for the new prison regulations was that inmates had become adept at using the former telephone system to direct criminal activity, including fraud, drug trafficking, and witness intimidation). *See also Pope v. Hightower,* 101 F.3d 1382, 1385 (11th Cir.1996) (noting that prison restrictions on inmates' telephone use were justified by the legitimate government objective of reducing criminal activity); *Israel v. Cohn,* 6 Fed.Appx. 348, 350 (7th Cir.2001) (unpublished opinion) (noting that prison restrictions on inmates' use of the telephone prevents

"criminal activity and harassment of the public, judges, and jurors"); *United States v. Rivera,* 292 F.Supp.2d 838 (E.D.Va.2003) (noting that evidence of approval for murder of government witness was obtained from recorded prison telephone conversations).

**41.** Nothing herein is intended to suggest that NNRJ may not choose to change its policy and strike a somewhat different policy. For example, NNRJ may conclude that the penological interest in monitoring inmate calls is less compelling where the calls are to and from the FPD offices. Of course, this depends on NNRJ officials having confidence that persons at FPD will not transfer the calls to third parties, that FPD officials will not take part in any criminal activities, as well as other factors not listed here.